827 So.2d 134 (1998)
Willie BURGESS, Jr.
v.
STATE.
CR-93-2054.
Court of Criminal Appeals of Alabama.
November 20, 1998.
Rehearing Denied February 5, 1999.
*145 Thomas M. DiGiulian, Decatur; and William Middleton, Decatur, for appellant.
Bill Pryor, atty. gen., and Michael B. Billingsley, asst. atty. gen., for appellee.
COBB, Judge.
This case was originally assigned to another judge on the Alabama Court of Criminal Appeals. It was reassigned to Judge Cobb on August 7, 1998.
Willie Burgess, Jr., appeals from his conviction of capital murder, see § 13A-5-40(a)(2), Ala.Code 1975. Burgess was tried before a jury on the charge that he intentionally murdered Louise Crow during a first-degree robbery. Following a guilty verdict, the jury recommended, by an 11-1 vote, that Burgess be sentenced to death by electrocution. On August 24, 1994, the trial court sentenced Willie Burgess, Jr., to death. This appeal follows. We affirm.
The State's evidence tends to show the following, as set out in the trial court's sentencing order:
"[O]n the morning of January 26, 1993, [Burgess] rode his bicycle to the Decatur *146 Bait [and Tackle] Shop located at 214 Sixth Avenue, S.E., Decatur, Alabama, with the intention of committing a theft. He entered the shop and had a dialogue with the owner, Mrs. Louise Crow. The defendant then left the shop, returned home, changed clothes and walked back to the shop. The defendant again entered the shop, pulled out a .25 caliber semi-automatic pistol, demanded money from the cash drawer and ordered the owner to enter the shop's bathroom. Once the victim had entered the bathroom, the defendant shot her in the face at close range, killing her. He then stole the victim's car, picked up his girlfriend and her child and headed toward Huntsville, Alabama. The defendant was arrested in route to Huntsville, and at the time of arrest he was in possession of the victim's car, a .25 caliber semi-automatic pistol and a quantity of currency."
After being returned to the custody of the Decatur police, Burgess made an admission to police detectives. Then, as he was walked through the parking lots between the Decatur City Hall and the Morgan County Jail, Burgess, while being videotaped by a cameraman for a local television station, made another admission in response to questions from reporters in which he admitted killing Mrs. Crow.

I.
Burgess argues that the trial court erred in denying his challenges for cause against two veniremembers, Mr. H. and Mr. C. because, he argues, both had fixed opinions of his guilt and, therefore, could not be impartial jurors.
When defense counsel was questioning the panel that included Mr. H. and Mr. C., he asked them whether they had heard anything about the case from any source. Mr. C. answered:
"The only thing I've heard about itI used to be a part-time cab driver back year before last and last yearis just from customers. Sometimes they talk about it generally. And on TV and newspaper. Other than that, that's it."
(R. 398-99.) When asked the same question, Mr. H. answered:
"What I've seen on TV and read in the paper and heard folks talking, but it was people who didn't know any more than I did from reading the papers."
(R. 400.)
After asking the veniremembers what they knew about the case, defense counsel then asked them if they had formed an opinion about his client's guilt or innocence. When defense counsel asked Mr. C. the question, the following dialogue took place:
"MR. LAVENDER (defense counsel): Mr. C.?
"MR. C.: All I can go by is just what hearsay and that hearsay don't mean nothing.
"MR. LAVENDER: I understand, except the problem is sometimes we know some things that we shouldn't know. We know some things that may not be true. That's why we call it hearsay and that's why it's not admissible in a court of law.
"MR. C.: Well, being a cab driver, you hear more than what you normally should hear and a lot of it's been exaggerated more than it should be, so I can't, you know, sayhonestly, I couldyes or no, just because of what I've heard.
"MR. LAVENDER: Let me ask you this question then, Mr. C. Suppose that you were a juror in this case and the district attorney put on his case and I put on my case, and you went to deliberate and you got to thinking, `Well, you *147 know, I know something about this case that he didn't tell me, that the D.A. didn't tell me and that Mr. Lavender didn't tell me.' Could you just forget about that?
"MR. C.: No.
"MR. LAVENDER: So if you were possessed of some facts through what you've seen, read, or heard, that didn't come out in this courtroom, you couldn't ignore those facts?
"MR. C.: I would bring it to his attention that I've heard about it. Let's say he brought it up to a certain stance that it rung a bell, something was said. I'd bring it to attention.
"MR. LAVENDER: Of your fellow jurors?
"MR. C.: Yes.
"MR. LAVENDER: Even if the court had told you to disregard everything you've seen, read, heard about this case except what you heard in this courtroom?
"MR. C.: No, I wouldn't say it then.
"MR. LAVENDER: You would keep it to yourself?
"MR. C.: Yes.
"MR. LAVENDER: You think you could exclude that and say, `Well, I don't know that. Let me put this out of my mind and decide this case on just these facts.'
"MR. C.: I couldn't say."
(R. 407-10.) Then, when Mr. H. was asked the same question, the following dialogue occurred:
"MR. LAVENDER: You don't know anything about it, Mr. H.?
"MR. H.: What I seen on the TV, I'm sure will be discussed in this trial, but I have opinions based on that, of course.
"MR. LAVENDER: What is that opinion?
"MR. H.: That opinion is that he did the deed.
"MR. LAVENDER: What if some of those things that you assumed will be discussed in this trial aren't discussed in this trialsome things you've seen on TV, or heard. Would you be able to put those things out of your mind?
"MR. H.: I hope I would be able to make a decision based on what I hear in here, but I don't know that I could put it out of my mind.
"MR. LAVENDER: And again, I'm sure you hope that, but, you know, I need to get a little bit past that. And that isand you heard me ask the questions earlierif there was something say you're on the jury; the 12 of you deliberatethe 14 of you, I suppose, are deliberating and there's something about this case that you heard that was on television that has caused you to form this opinion you've got, and Mr. Burrell [the prosecutor] never presented that evidence to you and neither did I. Would you be able to ignore it?
"MR. H.: I can't tell you for sure that I could.
"MR. LAVENDER: The things that you've seen or heard, I assume, [that] indicated my client was guilty?
"MR. H.: Yes.
"MR. LAVENDER: Do you have an opinion of his guilt or innocence such that you're biased against him?
"MR. H.: No, I don't think thatI don't think that's the case. I don't think that my opinion is so strong that I would beassumed to be biased before the trial begins.
"MR. LAVENDER: Would you require some kind of proof from me, the defense, to prove my client is not guilty?
"MR. H.: No."
*148 (R. 414-17.) Before this line of questioning, the prosecutor had asked the venire the following question:
"I want to ask you, do any of the 10 of you who have seen or read something about this caseI'm not asking if you can forget it. I don't think anybody can just wipe something out of their mind, what they've heard or read or know. But what I do want to ask you, are there any of you 10, because of what you've read or heard on television, who do not believe that you can serve as a juror in this case and base your verdict on the evidence that you hear in here? In other words, would you already have your mind made up regardless of what we do? Any of you feel like you would?"
Although two other veniremembers answered that they could not fairly serve as jurors because of what they knew, Mr. C. and Mr. H. did not. (R. 365.) Nor did either veniremember indicate that he had a fixed opinion as to the guilt or innocence of Burgess when questioned by the trial court.
Burgess also argues that Mr. H., a high school choral director, was aware that Burgess's cousin had been charged in the "brutal murder" of one of Mr. H.'s former students, thus giving Mr. H. an additional reason to be biased against Burgess. A review of the record shows that Mr. H. never indicated he knew the Burgess family was connected to the murder of his former student, even though at one point the prosecutor thought Mr. H. had done so. When the prosecutor asked the venire whether any of them had close friends who had been victims of crimes, Mr. H. responded, "I had a student that was murdered less than a year ago." (R. 360.) No further information was garnered from Mr. H. about what he knew about that murder or whether he harbored any bias against Burgess because of a possible family connection with the crime. We are bound by the record and will not assume that Mr. H. was biased, based on allegations or arguments in a brief to this court reciting matters not disclosed by the record. Harris v. State, 420 So.2d 812, 816 (Ala.Cr.App.1982).
"Section 12-16-150, Code of Alabama 1975, provides that, when a juror `has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict,' a challenge for cause is proper. Nobis v. State, 401 So.2d 191 (Ala.Cr. App.), cert. denied, 401 So.2d 204 (Ala. 1981). The juror must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused. The juror's opinion must be fixed to the point that it would bias the verdict which the juror would be required to render. Johnson v. State, 356 So.2d 769 (Ala.Cr.App. 1978); McCorvey v. State, 339 So.2d 1053 (Ala.Cr.App.), cert. denied, 339 So.2d 1058 (Ala.1976); Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Cr. App.1977), cert. denied, 356 So.2d 234."
Thomas v. State, 539 So.2d 375, 380 (Ala. Cr.App.), aff'd, 539 So.2d 399 (Ala.1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989).
"`Ultimately, the test to be applied is whether the juror can set aside [his] opinions and try the case fairly and impartially, according to the law and the evidence. This determination again is to be based on the juror's answers and demeanor and is within the discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence.'"
Marshall v. State, 598 So.2d 14, 16 (Ala.Cr. App.1991), quoting Knop v. McCain, 561 *149 So.2d 229, 232 (Ala.1989) (citations omitted).
While both veniremembers acknowledged that they had heard about this case, and Mr. H. stated that he had formed an opinion based on what he had heard, seen, or read that Burgess had "done the deed," neither veniremember indicated that he was biased or had a fixed opinion as to Burgess's guilt or innocence so that he could not fairly and impartially sit as a juror. We note that, although both veniremembers told trial counsel that they could not put what they knew about the facts of the case "out of their minds," this response came only after the prosecutor had indicated to the panel, "I don't think anybody can just wipe something out of their mind, what they've heard or read or know." Thus, while Mr. H.'s and Mr. C.'s answers may have appeared to contradict their assertions that they were not biased or that they did not have a fixed opinion, their answers seem to reflect what they had just heard another lawyer in the courtroom say. This is not at all surprising. As the United States Supreme Court noted in Patton v. Yount, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984):
"This is not unusual on voir dire examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially."
Our review of Mr. H.'s and Mr. C.'s voir dire responses does not reveal that either potential juror had a fixed opinion as to Burgess's guilt so as to bias his verdict. Thus, we conclude that the trial judge did not abuse his discretion by denying Burgess's challenges for cause as to either person.[1]

II.
Burgess argues that the State discriminated against women in the use of its peremptory challenges, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), a case decided by the United States Supreme Court two months before the trial of this case. Burgess points out that the State used 11 of its 15 peremptory strikes to remove women from the jury, resulting in a jury composed of 8 men and 4 women. He also points out that the venire from which the strikes were made consisted of 20 men and 21 women. He thus concludes that his case should be remanded for a hearing at which the State should be required to give its reasons for striking women.
Initially, we note that Burgess did not raise an objection at trial based on J.E.B.; therefore, we must apply the plain error rule. Rule 45A, Ala.R.App.P. A failure to object weighs heavily against a finding of prejudice. Williams v. State, 601 So.2d 1062 (Ala.Cr.App.1991). Before the plain error analysis can come into play in a *150 Batson-type issue, the record must supply an inference that the prosecution engaged in purposeful discrimination. See Ex parte Watkins, 509 So.2d 1074, 1076-77 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).
We have reviewed the record submitted on appeal in light of the factors set out in Ex parte Branch, 526 So.2d 609 (Ala.1987). We do not find sufficient evidence that the female veniremembers who were struck shared only the characteristics of gender. Nor do we find anything in the type and manner of the prosecutor's statements or questions during the extensive voir dire examination that indicated an intent to discriminate against female jurors. We do not find a lack of meaningful voir dire directed at the female jurors or that female jurors and male jurors were treated differently. There is no evidence that the prosecutor had a history of misusing peremptory challenges so as to discriminate against women. We find only that the prosecutor used many of his strikes to remove women from the venire. "Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination." Ex parte Trawick, 698 So.2d 162, 168 (Ala.1997), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997).

III.
Burgess next argues that the trial court erred in not approving sufficient funds to enable him to obtain an evaluation by a private psychiatrist and a medical evaluation of an alleged brain tumor, in violation of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Burgess argues that the trial court should have granted enough funds to allow necessary testing as part of a complete psychiatric examination, or, alternatively, should have granted funds for an MRI (magnetic resonance imaging) test and a complete neurophysiological evaluation, independent of the psychiatric evaluation.
"[F]or an indigent defendant to be entitled to expert assistance at public expense, he must show a reasonable probability that the expert would be of assistance in the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, the indigent defendant must show, with reasonable specificity, that the expert is absolutely necessary to answer a substantial issue or question raised by the state or to support a critical element of the defense. If the indigent defendant meets this standard, then the trial court can authorize the hiring of an expert at public expense."
Ex parte Moody, 684 So.2d 114, 119 (Ala. 1996).
The record reflects that Burgess and his original appointed counsel made a motion requesting funds for a psychiatric and medical examination at state expense. In response to that motion, the trial court ordered a mental examination to be conducted at state expense to determine the defendant's competency to stand trial and his mental state at the time of the offense. As a result of that order, Dr. Lawrence R. Maier, a licensed clinical psychologist in Huntsville, Alabama, evaluated Burgess on July 21, 1993. Burgess's attorneys were given access to Dr. Maier's outpatient evaluation report. On July 28, 1993, pursuant to Burgess's request, new counsel for Burgess were appointed, and they asked the trial court to allow them to withdraw any motions filed by previous appointed counsel that had not been ruled on, "to be refiled without anything being cut off, if that is no problem with the Court or the *151 District Attorney." (R. 14.) The trial court agreed.
On January 6, 1994, during motion proceedings, Burgess and his counsel had the following discussion with the trial court, in response to the trial court's inquiry as to any motions that they wanted to file that they had not already filed:
"MR. LAVENDER [defense counsel]: Judge, we have some indication that Mr. Burgess has had, or he tells us he has had, some problems with a brain tumor or brain cancer or something that he has seen a doctor before. We are going to need to get those records. He has been evaluated in Huntsville, I think, under a court order, I guess, before I got in the case. We anticipate we are going to request some funds for a private evaluation. I can't think of anything else right now, judge.
"THE COURT: The main thing you are going to want is some funds for possibly some private mental evaluation and discovery to get those records, if necessary?
"MR. LAVENDER: Yes, sir.
"MR. BIGGS [defense counsel]: And physical examination too, if it's a brain tumor or brain cancer; some type of MRI or something to determine if there is a brain tumor or some type of physical defect.
"MR. LAVENDER: Judge, as a practical matter, the reason we didn't file a motion to request funds for a physical examination is that the way that worksand we are going to have to do this with the psychologistthe state requires us to pay that or to arrange for it. If we can't make arrangements to defer payments, we have to pay it, and we are reimbursed when our pay voucher is paid down the road somewhere. We were kind of wondering if the Court maybe knew some way around that. If we are talking about an MRI, we are probably talking about $1200 or $1300. The first thing we want to do is get Dr. Jacob's records and see what they indicate. If there is something to it, then we may need to look into that. I don't know how else to do that. That is what that motion would be in the nature of, and when Greg [Biggs] and I got together the other day after [Biggs] got out of the hospital, we didn't know how to like I said, we didn't want to file a regular motion because we can't foot an MRI bill."
(R. 19-20.)(Emphasis added.)
After that discussion, trial counsel assured the judge that they had a copy of Burgess's outpatient mental evaluation. They then made an additional motion for funds to hire an independent investigator. After discussing the need for an investigator, and the likelihood that forensic experts would be called as witnesses by the State, the trial court concluded:
"THE COURT: Okay. What I would like to do isI am going to approve the expenses. I am going to break your application for investigative expenses into two categories and state that the Court will approve $1000 for what I call general investigation and then $1000 for specialized or expert testimony, and I would want some documentation later with regard to those funds that you have spent after things are completed, but if you think either grant is not sufficient, then you can come back and ask for additional funds if necessary. I am going to say $1000 for investigation and $1000 for experts."
(R. 23.)(Emphasis added.)
The record does not reflect that trial counsel subsequently requested more funds, or made a specific request for funds for a physical examination or for an MRI. *152 In fact, it would appear from the discussion in the record, that the $1000 granted to the defense for expert witnesses was not in response to the discussion about the possible need for a physical examination, but an allowance for the defense to counter the State's anticipated forensic evidence, i.e., ballistics, blood splatters, autopsy evidence, and fingerprints. (R. 22.)
Based on the record, we conclude that the trial court did not deny Burgess funds to seek a mental or physical examination. When the defense requested funds for examinations, the request was granted by the court. The record does not disclose that a specific request for state funds to provide Burgess with a physical examination or an MRI was ever made. This issue is without merit.

IV.
Burgess also argues that the trial court erred in refusing to provide funds for the defense to hire experts to conduct mental or physical examinations before the defense incurred costs for those tests. As we discussed in Part III, it appears from the record that the defense never made a specific request for funds for such examinations. In fact, defense counsel explained to the trial court that the reason they had not made such a request is because they were not sure how to secure state funds for an MRI in advance of the examination. (R. 19.) Because there was never a denial of a request for funds, whether made in advance or not, this issue is without merit.
However, if trial counsel had been denied an advance payment of funds to secure a medical examination, there would be no error. That issue has been previously decided by Alabama courts:
"Section 15-12-21(e), Ala.Code 1975, provides that within a reasonable time after the conclusion of the trial or ruling on a motion for a new trial or after an acquittal or other judgment disposing of the case, a bill for services rendered may be submitted by the clerk of the court to the comptroller for payment. We see no reason to contravene the mandate of the legislature and allow for experts aiding indigent defendants to be paid before trial. As stated earlier, an indigent defendant is not entitled to the expert of his choosing, when the expert is to be paid at public expense. Accordingly, any expert who requires payment before trial could be replaced by another person with expertise in the particular field."
Ex parte Moody, 684 So.2d at 122.

V.
Burgess argues that the trial court committed reversible error when, before the jury retired to deliberate, he advised the jury that Burgess had withdrawn his plea of not guilty by reason of mental disease or defect. The charge Burgess now objects to was as follows:
"Ladies and gentlemen, [at] an arraignment which was some months ago the defendant entered two pleas at that timewhich was the time that he entered his pleaand he pled not guilty and not guilty by reason of mental disease or defect. During the voir dire process when we were asking you or all the jurorsprospective jurorsvarious questionsthe voir dire process, we call ityou heard some discussion then of the not guilty by reason of mental disease or defect ... plea. This plea was entered in the alternative and the defendant had decided prior to the commencement of trialhe decided to proceed only on the plea of not guilty. It was appropriate at the arraignment for the defendantthen he was called upon with his attorneys to tell the Court how he pled and that was appropriate then *153 and he had to tell at that time. Later, at the appropriate time, he withdrew the plea of not guilty by reason of mental disease or defect. I instruct you that you are not to hold the defendant's withdrawal of the alternate plea against him. I mention this only so that you do not or that you are not confused, having been told in the voir dire process that there might be some evidence relating to that and, of course, so I mention that only so you'll not be confused. The case is presented [on] the defendant's plea of not guilty."
(R. 1609-10.)
Burgess characterizes the instruction as an impermissible comment on "the defendant's failure to prove an insanity defense."
Initially, we note that Burgess never objected to this instruction at trial. In fact, in discussing the necessity of such an instruction, defense counsel told the judge:
"I'm sure in your introductory charge you told them about that we had entered a plea of not guilty, not guilty by reason of insanity. I'm sure Mr. Burrell [the prosecutor] told them. You might want to do that, Judge, so they won't be confused about where it is."
(R. 1499.) Then, after the judge omitted the instruction from his closing charge, and the prosecutor reminded the court of the instruction, defense counsel stated that there was no need to bring the jury back in before it began its deliberations. At that point, someone in the courtroom informed the judge that she had overheard one of the jurors questioning aloud when the jury was going to "go into the mental area" phase of the trial. Upon hearing that comment, the trial court, without any objection by defense, decided to bring the jury back into the courtroom and give the now-complained-of instruction. (R. 1607-08.) Because there was no objection at trial, we review this issue for plain error. Rule 45A, Ala.R.App.P.
A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App. 1991). A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonablenot a strainedconstruction. King v. State, 595 So.2d 539 (Ala.Cr.App.1991).
After considering the trial court's oral charge in its entirety, we conclude that it correctly instructed the jury that, although Burgess had entered a plea of not guilty by reason of mental disease or defect, he had properly withdrawn that plea and that the decision to withdraw the plea was not to be held against him. It is apparent from the record that, because of the court's opening instructions and because of the extensive questioning concerning the plea during voir dire, the jury was aware of the plea, and was actively questioning what it was supposed to do in regard to the plea. We commend the court for fashioning an instruction that answered the jury's concerns about the "insanity plea," yet reminded the jury that Burgess's decision to withdraw his plea was proper and could not be held against him. Burgess's arguments that the instruction was an improper comment on his failure to prove a sanity defense, that it destroyed the presumption of innocence because it suggested a consciousness of guilt, that it was incomplete because it omitted the fact that the court had denied Burgess the opportunity to present an insanity defense, and that it left the jury with the impression that normally a jury may hold the withdrawal of an insanity defense against a defendant are wholly without merit.

*154 VI.
Burgess argues that the trial court should have conducted fully sequestered individual voir dire because of the allegedly excessive and pervasive pretrial publicity. He also argues that, because there was not a fully sequestered individual voir dire, the group dynamics of the venire were such that potential jurors may not have been truthful or forthcoming about their prior knowledge of the facts, that they may not have disclosed racial biases harbored against the defendant, and that they may have been affected by the responses of other veniremembers.
Burgess made a pretrial motion for individually sequestered voir dire, to which the trial court responded:
"I would deny the motion for individual voir dire. If during the process of the voir dire I saw that this may be working a prejudice to the defendant, I would just have to reverse my ruling at that time and go to the individual voir dire. I would anticipate bringing the jury venire in in panels of 12 and questioning the venire 12 at a time and probably in four panels of 12.... It may be that questions could be asked in such a fashion as the District Attorney suggested and that is if a juror had heard some pretrial publicity that he merely acknowledge it and not indicate what he had heard."
(R. 26.) After an introductory voir dire by the trial court before the entire venire, the group was split into four panels of 12 each and a fifth panel of six potential jurors. The prosecutor and defense counsel conducted voir dire before these panels. Neither side made a request for sequestered voir dire of a particular individual after the jurors were questioned in panels.
The general rule regarding when to allow individual voir dire examination is set out in Waldrop v. State, 462 So.2d 1021 (Ala.Cr.App.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1985):
"As a general rule, it is within the trial court's discretion to allow individual voir dire of prospective jurors.... The mere fact that prospective jurors know something about a case, at the time of empaneling, is not unusual, nor is it sufficient to invoke individual voir dire where the trial court takes the necessary steps to ensure that the accused receives a fair trial by a panel of impartial and indifferent jurors."
462 So.2d at 1026. "Even in capital cases, there is no requirement that a defendant be allowed to question each perspective juror individually during voir dire examination." Hallford v. State, 548 So.2d 526, 538 (Ala.Cr.App.), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). See also, Taylor v. State, 666 So.2d 36 (Ala.Cr.App. 1994), aff'd on remand, 666 So.2d 71 (Ala. Cr.App.1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). Moreover, in Haney v. State, 603 So.2d 368, 402 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993), this Court held that questioning a venire in panels met the requirements of due process and also provided assurance that any prejudice on the part of the jurors would be discovered. See also, Boyd v. State, 715 So.2d 825, 848 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.1998).
Having reviewed the transcript of the entire voir dire examination, we find no indication that the pressure of "group dynamics" kept veniremembers from answering questions truthfully, induced them to hide information from the court, or pressured them into accepting the views of *155 other veniremembers.[2] Our review of the voir dire indicates that the method of examination and the empaneling of the jury "provided reasonable assurance that prejudice would have been discovered if present." Haney v. State, 603 So.2d at 402. The trial court did not abuse its discretion in conducting voir dire in panels, rather than individually sequestered voir dire.

VII.
Burgess next argues that the trial court erred in not conducting a fully sequestered individual voir dire after it was reported that a potential juror, Mr. O., was telling other veniremembers that he thought Burgess was guilty. Burgess also argues that the court erred when it did not quash the entire venire because of Mr. O.'s behavior.
The record reflects that, after voir dire, but before the jury was struck, the trial court discovered that two potential jurors had informed a clerk of the jury commission that a potential juror, Mr. O., had attempted to discuss his opinion of the case with them. The two jurors were individually questioned. The first juror told the trial court that, the day before, while she and another juror were in a smoking room adjacent to the jury lounge, Mr. O. approached them and the following occurred:
"[H]e started talking about the tapes and he made the remark, `[I] saw the tapes. I know he's guilty; he said he did it.' And you had put us under orders to leave it alone; nothing said; just don't mention it, and I looked at him and I told him, I said, `Sir, if that's what you're going to talk about, shut up. We don't want to hear it.' And he started to say something else, and I said, `I've done told you we don't want to hear it. The judge told you the same thing he told us and he told us to keep our mouth shut.' And so he didn't say anything else."
(R. 660.) The juror remembered two other persons who were jurors from another trial were also in the smoking room. The other juror was also individually questioned, and she recounted similar facts. When these two jurors were asked by the prosecutor if they were influenced by Mr. O.'s comments, the first juror responded, "No, I don't think that he influenced me at all. I think he kind of made me mad because he didn't obey what we were told to do." (R. 664.) The second juror responded, "No, sir, not me because he's innocent until proven guilty. Y'all got to prove that." (R. 683.)
After these two jurors were individually questioned, Mr. O. was questioned. While he admitted talking to the two other jurors, he denied telling them that he thought Burgess was guilty. The trial court and counsel then discussed how to question the remaining venire in order to establish whether Mr. O. had talked to anyone else about the case. Defense counsel suggested individual voir dire, so that the entire venire would not be tainted if one person related information about Burgess's admission to reporters that had been aired on the local television news. (R. 688-90.) When the trial court asked counsel for their comments on his "thoughts" to question the entire venire to determine whether the members could identify Mr. O. and whether they had *156 heard any comments from him before individually questioning any who responded that they had, defense counsel said, "Judge, none other than the one I had argued about." (R. 702.)
The trial court then called the entire venire into the courtroom and instructed them as follows:
"I want to ask each one of you, and I know that there's at least two, but I want to ask all of you now if any one of you, and if the answer is yes I want you to stand up, if any one of you have heard anything said by Mr. O. regarding this case, said up in the jury lounge or in the hallway, or anyplace as far as that goes? Have any of you heard anything said by Mr. O. concerning the case or his opinion about the case or anything at all? And if you have, then at this point all I want you to do is stand so I will know who you are, and then later on, of course, what I'm going to do is I'm going to ask you what you heard, but I'll do that personally or individually with you."
(R. 703-04.) Then, having segregated Mr. O. from the rest of the venire, he identified Mr. O. to the venire, acknowledged the other two jurors who had already come forward, and asked if anyone else had heard Mr. O. say something about the case. One other juror stood. Defense counsel then asked the venire if anyone had changed their opinion about the case because of what anybody might have said to them. There was no response from the venire. The third veniremember was then individually questioned. During the questioning, she told the trial court:
"Mr. O. tried to talk to me yesterday at lunch. We were in the [jury] lounge. I just ate my lunch in the lounge and when he started talking to me, I told him I didn't know anything about this case; I didn't want to know anything about this case. He tried to say something again and I said, `I'm not going to talk about it.' And I cannot remember what he started to say. I've been sitting here trying to remember it, but I really don't."
(R. 713.) When asked if she saw Mr. O. talking to anyone else, the juror said that she recalled seeing him sitting with some women and talking about a "ballplayer getting hit with a ball." (R. 715.) When asked if she had been influenced by anything she had heard, the juror responded, "I have no opinion about this case, and I don't want to have one." (R. 716.) Defense counsel then made a motion to quash the entire venire because, he argued, it was tainted by Mr. O.'s behavior and the questioning resulting from Mr. O.'s behavior, as well as by the likelihood that Mr. O. had approached other veniremembers who did not come forward. The trial court responded:
"I'm going to deny the motion. I'm ruling, in effect, that I believe that the jury has not been tainted by the activity of Mr. O., nor the activity that we've gone through this morning to inquire whether or not the jury had been tainted; and that this jury, the remaining members of this jury, is able to follow, or has followed, the Court's instructions and is able to understand the Court's instructions."
(R. 722-23.)
We note that, while Burgess argued that the trial court should engage in individually sequestered voir dire of each veniremember concerning Mr. O.'s conduct, he did not object to the trial court's decision to ask the entire venire who had heard Mr. O. talk about the case, and then to follow up with individual voir dire of those who responded that they had. Therefore, we review that issue for plain error only. Rule 45A, Ala.R.App.P.
*157 "Whether there has been a communication with a juror and whether it has caused prejudice are questions of fact to be determined by the trial court in the exercise of sound discretion." Gaffney v. State, 342 So.2d 403, 404 (Ala.Cr.App. 1976), cert. denied, 342 So.2d 404 (Ala. 1977). We agree with the trial court that there was no need to quash the entire venire, because the venire had not been tainted by Mr. O.'s comments, or by the process of determining the extent of Mr. O.'s communications.
"`In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion "where the trial court investigates the circumstances under which the remark was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark." Bascom v. State, 344 So.2d 218, 222 (Ala.Cr.App. 1977). However, the trial judge has a duty to conduct a "reasonable investigation of irregularities claimed to have been committed" before he concludes that the rights of the accused have not been compromised. Phillips v. State, 462 So.2d 981, 990 (Ala.Cr.App.1984). His investigation should include a "painstaking and careful" inquiry into the alleged juror misconduct. Lauderdale v. State, 22 Ala.App. 52, 54, 112 So. 92, 93 (1927).
"`. . . .
"`... [W]hen the trial judge acts promptly to investigate the circumstances surrounding the making of an inherently prejudicial remark by a veniremember, determining specifically whether the remark was made and whether the remark had a prejudicial effect on those who, ultimately selected to serve as jurors, heard it, there is no error in the denial of a motion for mistrial based on jury contamination.
"`. . . .
"Ex parte Lasley, 505 So.2d 1263, 1264 (Ala.1987)."
Riddle v. State, 661 So.2d 274, 276 (Ala.Cr. App.1994), quoting Holland v. State, 588 So.2d 543, 546, 548-49 (Ala.Cr.App.1991).
"What constitutes a `reasonable investigation of irregularities claimed to have been committed' will necessarily differ in each case. A significant part of the discretion enjoyed by the trial court in this area lies in determining the scope of the investigation that should be conducted.
"`. . . .
"... As long as the court makes an inquiry that is reasonable under the circumstances, an appellate court should not reverse simply because it might have conducted a different or a more extensive inquiry. Generally, where the judge polls the jury and each juror indicates that there has been no improper communication, that is sufficient. See Ham v. State, 540 So.2d 805, 810 (Ala. Cr.App.1988); Ex parte Weeks, 456 So.2d 404, 407 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985). There is no absolute requirement that a juror alleged to have received an improper communication be examined apart from the other jurors. See Smith v. State, 432 So.2d 550 (Ala.Cr.App.1983), and Hopkins v. State, 429 So.2d 1146, 1152 (Ala.Cr.App.1983)(wherein the jury was questioned together as a group)."
Sistrunk v. State, 596 So.2d 644, 648-49 (Ala.Cr.App.1992).
In this case, the trial court individually questioned the offending veniremember, and each veniremember to whom that member had spoken. After a thorough investigation, the trial court determined that the veniremembers to whom Mr. O. had spoken were not influenced by his *158 remarks. The court then removed Mr. O., not only from the venire, but from the jury rolls completely. There is absolutely no indication in the record the other veniremembers were tainted by Mr. O.'s expressions of opinion regarding the case. Nor is there any indication that there were any veniremembers who were not forthcoming to the trial court, when asked if they had talked to Mr. O. In fact, the court's investigation revealed that the jurors in the venire were very serious about following the court's directives. We do not find error, much less plain error, in the trial court's decision to conduct an inquiry of the entire venire before conducting individual voir dire.
The trial court's findings that the venire had not been tainted by the conduct of Mr. O. or the resulting investigation and its denial of the motion to quash the venire were not an abuse of discretion.

VIII.
Burgess argues that the trial court erred when it denied his motion for a change of venue. He argues that pervasive pretrial publicity and the prevailing community attitudes prevented him from receiving a fair trial in Morgan County.
Before denying the change-of-venue motion, the trial court heard evidence on the extent of the publicity surrounding the murder. Burgess presented evidence from the three major radio stations in the Morgan County area, all of which aired news stories from January 26, 1993, through January 29, 1993, related to the murder and Burgess's arrest and his subsequent admission to reporters. None of the radio stations carried stories on the murder after January 29, 1993, until the change of venue hearing in February 1994. The trial court also considered testimony from the three television stations in the Morgan County area. All of the television stations broadcast news stories in January 1993 concerning the murder and Burgess's arrest. These newscasts included the televised admission of Burgess made to reporters as he was escorted from the Decatur City Hall to the Morgan County jail. The trial court also heard testimony from the news editor of the local newspaper, The Decatur Daily. During January 1993, the Decatur Daily contained news stories about the murder and Burgess's arrest and admission. After January it contained sporadic stories which mentioned the murder during the spring and summer of 1993, and then published a letter to the editor about a possible change of venue in January 1994. There was also evidence of news stories published in the Huntsville Times newspaper in January and February 1993, with sporadic articles that mentioned Burgess printed throughout 1993, up until the change-of-venue hearing.
On March 9, 1994, the trial court convened a sample jury from the venire of another court session, and conducted a voir dire of that jury to ascertain the juror's ability to impartially hear the case. The results of the court's questioning of this sample jury indicated that all 12 jurors had heard about the murder from some source. Eight of those jurors had seen Burgess's televised admission. Seven of the jurors indicated that they had formed some opinion about the murder, but only one juror felt that she had been so influenced by what she knew about the murder that she could not follow her juror's oath. Eleven jurors told the trial court that they could set their opinions aside, listen to the evidence, follow the instructions of the court, and return a fair and impartial verdict based only on the evidence and the law. When the trial court asked this sample jury, "Do you think he is guilty now without hearing of *159 the evidence?" none of the jurors responded.
On April 14, 1994, after reviewing all the evidence presented by both parties, and after taking the extraordinary measure of empaneling a sample jury randomly selected from individuals summoned for jury duty, the trial court made the following ruling:
"After careful consideration of the testimony presented by both movant and respondent and the responses given by sample jurors, the Court has determined that movant has failed to meet his burden of showing, to the reasonable satisfaction of the Court, that a fair and impartial trial cannot be had and an unbiased verdict cannot reasonably be expected. In reaching its decision, the Court has considered the substance, scope and breadth of media coverage surrounding this case. The Court has also considered the effect that the passage of time has had on pretrial publicity. In addition, the Court has considered the responses given by sample jurors together with all of the other testimony presented by the parties and has determined that, while it may not be possible to find a jury panel which is totally ignorant of the facts and issues in this case, it has not been demonstrated that the constitutional standard for a fair and impartial jury would be violated. It cannot be said, weighing all of the evidence received by the Court together, that the community was so saturated by prejudicial publicity that the defendant could not be given a fair trial."
(C.R.36-37.)
"The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, `indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). "A defendant is entitled to a change of venue if he can demonstrate to the trial court that he cannot receive a fair and impartial trial in the county where he is to be tried." § 15-2-20, Ala.Code 1975; Nelson v. State, 440 So.2d 1130, 1131, (Ala.Cr.App. 1983).
"`"There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pretrial publicity `has so saturated the community as to have a probable impact on the prospective jurors' and thus renders the trial setting `inherently suspect.' McWilliams v. United States, 394 F.2d 41 (8th Cir. 1968); Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In this situation, a `pattern of deep and bitter prejudice' must exist in the community. Irvin v. Dowd, 366 U.S. at 727, 81 S.Ct. 1639."'
"`"The second situation occurs when the defendant shows `a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice.' McWilliams v. United States, supra."'"
Hyde v. State, 778 So.2d 199, 231 (Ala.Cr. App.1998), quoting Holladay v. State, 549 So.2d 122, 125-26 (Ala.Cr.App.1988). It is the former situation that Burgess argues rendered Morgan County "inherently suspect" as a venue and thus, unable to render a fair trial.
"Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.... The presumed prejudice principle is `rare[ly]' applicable, and is reserved for an `extreme situation.'"
Coleman v. Kemp, 778 F.2d 1487, 1490 (11th Cir.1985) (citation omitted).
*160 In determining whether Burgess has shown inherent prejudice, we are satisfied that Burgess has met the "saturation of the community" prong. The evidence showed that the radio, television, and newspapers that had reported the murder and confession in the Morgan County area reached a substantial number of the citizens in the community. It is clear from the answers of the sample jury that almost everyone had heard about the murder, and that most had either witnessed Burgess's admission on television, or had heard about it in some way.
However, we do not believe Burgess has proved that the pretrial publicity was "prejudicial and inflammatory." Burgess compares his pretrial publicity with the "extreme situation" described in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). Rideau, like this case, involved a televised confession that was repeatedly rebroadcast of a robbery and murder and that saturated the community in which the trial of the offenses was held. However, the confession in Rideau was described by an indignant United States Supreme Court as a televised "kangaroo court" presided over by the sheriff, in which the accused, flanked by two state troopers, confessed in response to the sheriff's leading questions. The Supreme Court implied that law enforcement had staged the production for dissemination to the public prior to trial. Unlike Rideau, there is no evidence in this case that the admission to reporters was contrived by law enforcement or that it resulted from a conspiracy between the police and the media. The videotape of Burgess's admission, which was the basis for all of the pretrial publicity, shows a sober, relaxed Burgess walking across the courthouse parking lot, escorted by two police investigators,[3] as he responded in a composed, thoughtful, and articulate manner to questions posed by news reporters. In fact, it was the nature of Burgess's admission, as much as the admission itself, that filled the news reports on television, radio, and newspapers during January and February 1993. Burgess's admission to reporters, as the television cameras rolled, was publicity of his own making. And it was Burgess's conversation with the media that sensationalized what was otherwise a straightforward, purely factual reporting of a murder investigation and subsequent arrest. However, because that televised admission was subsequently admitted into evidence, any prejudice from the publicity resulting from that admission was negligible. Henderson v. Dugger, 925 F.2d 1309, 1314 (11th Cir.1991). Apart from the news stories describing and showing Burgess's televised conversation with the media, the pretrial reporting was factual, and did not contain inflammatory or prejudicial commentary. Pretrial publicity that is purely factual in nature is acceptable and will not support a change of venue. Heath v. Jones, 941 F.2d 1126, 1135 (11th. Cir. 1991).
We also agree with the trial court that the period between the murder and trial served as a "cooling off period" that lessened the impact of any potentially inflammatory pretrial publicity. Heath v. Jones, supra; Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). The murder and Burgess's arrest and subsequent admission to the television cameras all occurred on January 26, 1993. Almost all of the media attention and news reporting *161 concerning Burgess and his admission to the media took place during the weeks after the murder. After that, Burgess "basically drifted away from major consciousness." (R. 110.) There were no more headline stories, radio news reports, or television reports until Burgess's change-of-venue hearing in February 1994. His trial did not start until June 1994. The lack of media attention between February 1993, and June 1994, dimmed memories and negated much of the sensationalism of Burgess's admission to the media in January 1993.
Based on the foregoing, we hold that Burgess was unable to show that the pretrial publicity, much of it of his own making, marred his trial sufficiently for us to conclude that this is one of those extremely rare cases in which we should find inherent prejudice. Heath v. Jones, 941 F.2d at 1136.

IX.
Burgess contends that his conviction and sentence are due to be reversed because of several instances of alleged prosecutorial misconduct during closing arguments. We initially note that Burgess failed to object to any of the comments he now challenges. Although this failure to object does not preclude our review under the plain error rule, Rule 45A, Ala.R.App.P., it does weigh against any claim of prejudice. Kuenzel v. State, 577 So.2d 474, 481-82 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"Questions of the propriety of argument of counsel are largely within the trial court's discretion. McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App. 1978), and that court is given broad discretion in determining what is permissible argument. Hurst v. State, 397 So.2d 203, 208 (Ala.Cr.App.), cert. denied, 397 So.2d 208 (Ala.1981). Moreover, this Court has stated that it will not reverse unless there has been an abuse of discretion. Miller v. State, 431 So.2d 586, 591 (Ala.Cr.App.1983).
". . . .
"... In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued at their true worth and are not expected to become factors in the formulation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982)."
Bankhead v. State, 585 So.2d 97, 105-07 (Ala.Cr.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991).
We note that, prior to both guiltphase and sentencing-phase arguments, the trial court instructed the jury, "I want to stress to you that statements and arguments made by counsel are not evidence. You should disregard any remark or statement or argument which is not supported by the evidence or by the law as given to you by the court." The trial court later stated, "I caution you that statements of counsel [are] not evidence in the case." (R. 1540, 1709.) Likewise, at the end of sentencing argument, the trial court instructed the jury, "I charge you, members *162 of the jury, that [the prosecutor's] argument about Mrs. Crow's long walk down the hall or any other comments by him that caused any passion or prejudice to influence you in any way should be disregarded and not considered by you in the matter." (R. 1753.) Jurors are presumed to follow the court's instructions. Holland v. State, 588 So.2d 543, 549 (Ala.Cr.App. 1991).

A.
Burgess argues that the prosecutor misstated the law as it applied to several critical aspects of the case.
He first argues that the prosecutor misled the jury into believing that felony murder was a no-fault killing. The prosecutor argued:
"Felony murder says if you cause someones death with no fault on your part while you're involved in a robbery or certain other offensesbut that's the one that's involved in this casethen you're guilty of murder. In other words, if Willie Burgess had had a child dart out in front of him as he was leaving in the parking lot in the car, that he couldn't see, couldn't stop, couldn't help it, and killed that child, he would be guilty of felony murder, even though if he wasn't involved in a robbery, it would have been a complete accident."
(R. 1578-79.) We do not find this argument to be so misleading that it caused the jury to reject felony murder as an "unacceptable alternative" to capital murder. Burgess was arguing that, because he accidentally shot Mrs. Crow during the robbery, he was guilty only of felony murder. We see little difference between the prosecutor's example of felony murder and Burgess's theory of defense. The prosecutor's bottom line was that Mrs. Crow's death was no accident. Prosecutors are given wide latitude during rebuttal argument to respond to assertions and statements made by defense counsel in previous argument to the jury. Davis v. State, 494 So.2d 851, 854 (Ala.Cr.App.1986). We note that the trial court correctly instructed the jury on the elements of felony murder after the arguments of counsel. We see no plain error here.
Burgess also argues that the prosecutor's sentencing-phase argument sought to mislead the jury as to the legal meaning of "mitigating circumstances" and to preclude the jury from considering mitigating evidence. He also argues that the prosecutor disparaged the mitigating circumstance of age and misled the jury on the law regarding age as a mitigating circumstance. Having reviewed the arguments of counsel, we disagree. The trial court correctly instructed the jury on mitigating circumstances, including the mitigating circumstance of age, and its responsibility to weigh those circumstances against the aggravating circumstance. Nothing the prosecutor argued improperly urged the jury to disregard those instructions. Kuenzel v. State, 577 So.2d at 500. "[I]mpeachment of the evidence of a defendant and the matter of impairment of its weight are properly matters for argument of counsel...." Mosley v. State, 241 Ala. 132, 136, 1 So.2d 593, 595 (1941). Whatever is in evidence is subject to legitimate comment by the prosecutor. Stewart v. State, 601 So.2d 491, 506 (Ala.Cr.App. 1992). The prosecution's argument as to mitigating circumstances did not constitute plain error.
Burgess argues that the prosecutor deceived the jury and thereby made the death penalty more acceptable by arguing:
"Mr. Lavender also told you that he felt like in trying a case like this he was trying a case to a pro-death penalty *163 jury. Because, as you know, people who oppose the death penalty had been removed. Well, that's true. But people who would automatically impose the death penalty in this case have also been removed.
"You should not adjust your feelings and somehow try to make up for the fact that some anti-death penalty folks have been removed, because the folksby the same test, the folks who were pro-death penalty were removed. We wound up left with a jury who, in theory, has an open mind. They can, if they felt it was appropriate, return the death penalty, and they cannot if they feel it [is not] appropriate."
(R. 1722-23.) Burgess claims this comment constitutes plain error because, he says, the record does not show that a juror was removed from the venire because of a "pro-death penalty" attitude. We do not agree. The prosecutor was replying to the argument of defense counsel, by arguing that the jury should disregard an irrelevant factor in determining Burgess's sentence. Whether or not the argument was factually correct, the prosecutor's argument gave a substantially correct overview of how a jury in a capital case is qualified. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). "A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel." DeBruce v. State, 651 So.2d 599, 609 (Ala.Cr.App. 1993), aff'd, 651 So.2d 624 (Ala.1994). There is no plain error here.

B.
Burgess next argues that at both phases of trial, the prosecutor improperly drew on his own experiences and the status of his office to bolster the state's case and to disparage Burgess's defense.

1. Guilt-phase Arguments.
Burgess argues that there were several instances during the prosecutor's guilt-phase closing argument where the prosecutor gave his personal opinion of the evidence. Specifically, he objects to the following in the prosecutor's closing arguments: (1) his statement that "I don't pretend to be an expert on firearms, but to me, somebody got one of these [guns] no more than two feet from my face" in commenting on Burgess's claim that the shooting was accidental; (2) his "sarcastic" comment "Sure, I believe that" in response to the defense's argument that although Burgess was pointing a loaded weapon at Mrs. Crow, he did not mean to shoot her; (3) his analogy of Burgess's defense with the response of the prosecutor's small children when they are caught in a lie; (4) his comment, "I've been in a bunch of [bathrooms] that you can lock somebody out, but I don't know that I've ever seen one that you can lock somebody in" in response to Burgess's argument that he was only taking Mrs. Crow to the bathroom to lock her in, not kill her, and Mr. Crow's testimony that the bathroom did not have an outside lock on the door; and (5) his comment, "I don't believe that. You saw him on television, and you saw what a chip he had on his shoulder" in response to Burgess's argument that Mrs. Crow had uttered racial slurs at him before he robbed and killed her. Burgess also argues that the prosecutor "testified" in his argument as to how Burgess's gun worked. Each of these arguments by the prosecutor was in response to Burgess's closing argument. "While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence." Sams v. State, *164 506 So.2d 1027, 1029 (Ala.Cr.App. 1986). We find that each of these comments was based on a legitimate inference, deduction, or conclusion drawn from the evidence and therefore did not constitute an impermissible injection of the prosecutor's personal opinion. Smith v. State, 588 So.2d 561, 572 (Ala.Cr.App.1991). There was no objection to any of these comments. We find no plain error.

2. Sentencing-phase Arguments.
Burgess contends that the following comments constituted improper argument: (1) "And I've heard the evidence now and I submit to you that what I told you is the truth," made at the beginning of the prosecutor's argument; (2) "[A]ny time I try one of these, the age is always used one way or the other as a mitigating circumstance. The fellow's 90 years old and killed somebody. You know, I guess that's in some mitigation. It's going to be less, maybe through 70. I don't know. That's up to you.... How old do you have to be to be responsible?"; (3) "But at the same time we're not talking about the kind of murder during the course of a robbery that I've seen sometimes before; you have a drug deal go bad and somebody snatches their money and somebody else fires off a round and there's a killing.... I've tried a case like that. But that's not what we have here."; (4) "But there comes a time when we, as a society, simply have to say, `It's enough; we're not going to tolerate this and we are going to do whatever we can do to stop this.' And I submit to you this is that kind of case." We have examined each of these comments, as well as their context in the entire closing argument, and we find no plain error. We do not find that the prosecutor ever expressed to the jury that his office had determined that the death penalty was a more appropriate sentence in this case than in other capital murder cases. As discussed above, the prosecutor was rebutting the argument of the defense counsel concerning the weight to be accorded the evidence of mitigating circumstances. The fact that the prosecutor prefaced some of his comments with "I believe" or "I think" or some similar other expression does not render the comments improper. We hold, as the Alabama Supreme Court did in Ex parte Rieber, 663 So.2d 999 (Ala.1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), that "even if these comments were to be viewed as expression of the prosecutor's personal opinions and, thus, as `crossing the line' as permissible argument, they, nonetheless, would not constitute reversible error."

C.
Burgess next argues that the prosecution shirked its burden of proof by "inviting the jury to eschew the presumption of innocence along with the requirement of proof beyond a reasonable doubt." Burgess argues that the prosecutor did this by vouching for the sufficiency of the evidence, making personal attacks, misleading the jury as to the law regarding felony murder, arguing facts not in evidence, and arguing that "Burgess was guilty because he lacked remorse for the crime." We have carefully reviewed each instance cited by Burgess and find his claims to be without merit. The prosecutor, in his argument, was presenting his impressions of the evidence. Specifically, we can find no argument by the prosecutor that could be reasonably interpreted as arguing guilt based on a lack of remorse. A prosecutor "may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way." Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.1981), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981). *165 The prosecutor was arguing that the murder was an intentional killing, and Burgess was arguing that it was an accident. The prosecutor's argument and his rebuttal to the defense's argument was delivered in the heat of debate. Such statements are "usually valued by the jury at their true worth, and are not expected to become factors in the formation of the verdict." Bankhead v. State, supra.
Burgess also includes in this issue an argument that the trial court's instruction on circumstantial evidence was improper. Burgess argues that the trial court's explanation of circumstantial evidence, which included an analogy to an experienced hunter coming upon fresh tracks in new-fallen snow that he recognizes as a rabbit's track, from which the hunter could reasonably believe a rabbit had passed that way, constituted reversible error. Burgess argues that the instruction was "too simplistic," that it "trivialized the juror's responsibility," that it "insinuated the jury was like a hunter," and that it "ignored the complexities of this case." There was no objection to this instruction at trial. Burgess also argues that the trial court's instruction on felony murder was improper because it "failed to disabuse the jury of the idea that felony murder was a no-fault killing that occurs by complete accident." There was no objection to this instruction either. A trial court has broad discretion in formulating its jury instructions, provided they accurately reflect the law and the facts of the case. United States v. Padilla-Martinez, 762 F.2d 942 (11th Cir.1985), cert. denied, 474 U.S. 952, 106 S.Ct. 320, 88 L.Ed.2d 302 (1985). We believe that the circumstantial evidence instruction was complete and understandable. Burgess's concern about the jury's interpretation of such an instruction is unrealistic. Likewise, the trial court's instruction on felony murder was correct and complete, and, when considered in conjunction with the instruction on capital murder, gave the jury a clear picture of how to discharge its responsibilities. There is no plain error here.

D.
Burgess next argues that the prosecutor misled the jury into believing that in making its sentencing recommendation, there was a presumption that the death penalty was the appropriate sentence unless Burgess could prove that he deserved life imprisonment without parole. As a basis for this argument, Burgess points to the prosecutor's argument that there was "nothing ... put on in court here today in front of you that would suggest the most appropriate verdict in this case is not death in the electric chair." He then argues that the prosecutor built on that theme by "insinuating" that Burgess had failed to rebut this presumption, and then closed by urging the jury to "do the right thing."
In reviewing all of the prosecution's sentencing argument, we find that the prosecutor, while asking that the jury return a recommendation for the death penalty, did not imply to the jury that there was a presumption in favor of the death penalty and that the burden was on Burgess to prove that he was entitled to a sentence of life imprisonment without parole. His argument focused on weighing the aggravating circumstances against the mitigating circumstances, the inferences and conclusions to be drawn from the facts of the case, and his response to Burgess's argument that urged the jury not to "kill" him because the death penalty was not appropriate in this situation. "The fact that an argument has emotional overtones does not independently indict it as improper, and the propriety of argument rests primarily in the relation of its content to *166 issues relevant to the ... jury's concern." Rutledge v. State, 523 So.2d 1087, 1101 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988). Generally, the prosecution errs when it exhorts a jury to "do what's right" if that exhortation "implies that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law. Arthur v. State, 575 So.2d 1165, 1185 (Ala.Cr.App. 1990), cert. denied, 575 So.2d 1191 (Ala. 1991). After reviewing of the prosecutor's entire argument in this case, we do not believe by using the words "do the right thing," the prosecutor was asking the jury to ignore the evidence or the court's instructions. Indeed, the prosecutor asked the jury to remember during its deliberations the judge's instructions and to do the right thing, rather than "the easy thing." This argument, taken in context with the trial court's instructions regarding argument of counsel, and the court's complete instructions on the sentencing deliberation process, does not amount to plain error.

E.
Burgess next argues that the prosecutor argued nonstatutory aggravating circumstances to the jury. Specifically, he alleges the prosecutor argued that the following were aggravating circumstances: (1) "the victim's psychological torment"; (2) "the fact that Mrs. Crow was shot one time," implying that it constituted torture or terrible suffering; (3) "the value of Mrs. Crow's life"; and (4) "the statutory mitigating factor of victim participation." Our review of the prosecutor's argument indicates that Burgess's argument is without merit. The prosecutor began his argument by informing the jury that the one aggravating circumstance the State was relying on was the fact that the murder was committed during the course of the robbery. The "bits and pieces" of argument now complained of were comments on the evidence and responses to the mitigating circumstances presented by the defense. There were no objections to any of the prosecutor's argument on the grounds that he was presenting nonstatutory aggravating circumstances. Furthermore, even if the jury could have interpreted the prosecutor's argument as injecting improper aggravating circumstances, the trial court instructed the jury as follows: "[Y]ou may not consider any aggravating circumstance other than [murder committed during a robbery, first degree.]" We find no error here. Bankhead v. State, supra.
Burgess also argues that the prosecutor's comment that the victim, "at that point is turned into evidence. The person who was a wife and a relative and a friend had now got sealed up, put in a cooler, and is evidence in this case with a tag on it" improperly "exploited society's general outrage over crime" and denied him an individualized sentence.
Reviewing that comment in the context of the entire argument, we find that the prosecutor was arguing that the jury should view the evidence of the murder/robbery seriouslythat, unlike television dramas, Mrs. Crow was actually dead, and had been killed by Willie Burgess because he wanted some new clothes. There is no plain error here. (See this court's discussion of victim impact evidence in Part XXII, infra.)

F.
Burgess argues that the prosecutor improperly disparaged him as a person, impugned his character, and made remarks concerning his right to counsel in an attempt to distract the jury from its duty. We have reviewed each of Burgess's allegations and find them to be without *167 merit. The comments complained of were all arguments in response to Burgess's interpretation of the statements he had made to the police and to the press. We find that these arguments were each based on a legitimate inference, deduction, or conclusion from the evidence. See Smith v. State, 588 So.2d 561, 572 (Ala.Cr.App. 1991). "A prosecutor may legitimately base his argument on the evidence of the appellant's statement to the police." Hereford v. State, 608 So.2d 439, 442 (Ala. Cr.App.1992).
Burgess argues that the prosecutor impermissibly commented on the fact that he had exercised his constitutional right to counsel when he argued, "No matter what happened. He's had the opportunity to have lawyers represent him in this case. We have been in an orderly process." There was no objection to this comment. A review of the entire argument shows this comment was made in response to the defense's argument that the jury was going to "kill" or "take the life" of Burgess if it imposed the death penalty. DeBruce v. State, supra. Rather than a comment on the fact that Burgess had exercised his right to counsel, it was a reminder that, unlike Mrs. Crow, Burgess's fate was to be determined by the rule of law and the judicial system. This was not an impermissible attack on Burgess's exercise of his constitutional rights. See Cunningham v. Zant, 928 F.2d 1006, 1019 (11th Cir.1991); Dill v. State, 600 So.2d 343, 354 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

G.
Burgess next argues that the following comments by the prosecutor were improper comments on his right to remain silent: "There's not a way in the world that woman knocked that gun off and that bullet hit where it did and tracked the way it did. That's nothing but a lie, just a complete and absolute lie, because we've got nobody else that was there to see that. We've got him sitting on the gun that killed her. We've got the money in his pocket and him driving the car, but she's not here to refute that lie."
(R. 1572-73.)(Emphasis added.) There was no objection to this argument.
Burgess argues that the comment "we've got nobody else that was there to see that" allowed the jury to infer that if the prosecutor's conclusions as to what happened were not correct, Burgess would have come forward and corrected the error and that it was therefore an improper comment on the fact that he did not testify at trial.
A comment on the defendant's failure to testify is to be "scrupulously avoided." Arthur v. State, 575 So.2d 1165, 1186 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991). "Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant's right to remain silent has been violated." Windsor v. State, 593 So.2d 87, 91 (Ala.Cr.App.1991), quoting Padgett v. State, 45 Ala.App. 56, 223 So.2d 597, 602 (1969). "In a case where there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must be a close identification of the defendant as the person who did not become a witness." Windsor v. State, supra, quoting, Ex parte Williams, 461 So.2d 852 (Ala.1984). There are many Alabama cases which have been reversed because prosecutors have pointed out that the only remaining witness to the crime was the defendantthus indirectly commenting on the defendant's right to remain silent. In Ex parte Purser, 607 So.2d 301 (Ala.1992), *168 the defendant's conviction was reversed based on the following comment by the prosecutor in opening statements: "[The victim is] the only one out there ... when it all happens, and she can tell you what happened. Well, excuse me. She's not the only one, other than [the other deceased victim], who is no longer with us, and Allen Purser, who is on trial for [murder and attempted murder.]" Likewise, in Whitt v. State, 370 So.2d 736, 737 (Ala. 1979), the Court found the following to be an impermissible comment on the defendant's failure to testify: "The only person alive today that knows what happened out there that night is sitting right there."
After carefully reviewing the prosecutor's comments in the context of the entire argument of counsel, we conclude that the prosecutor's comment is not an indirect reference on Burgess's failure to testify, nor does it closely identify Burgess as the witness who failed to testify. Slaton v. State, 680 So.2d 879, 889 (Ala.Cr. App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997).
"`Alabama law clearly holds that "[w]here there is the possibility that a prosecutor's comment could be understood by the jury as reference to failure of the defendant to testify, Art. I, § 6 [Const. of Alabama of 1901] is violated.'" Ex parte Wilson, 571 So.2d 1251, 1262 (Ala.1990). However, `a prosecutor may legitimately base his argument on the evidence of the appellant's statement' to the police. Hereford v. State, 608 So.2d 439, 442 (Ala.Cr.App.1992). See also Henderson v. State, 584 So.2d 841, 855 (Ala.Cr.App.1988); Smith v. State, 588 So.2d 561, 570 (Ala.Cr.App. 1991); Kimble v. State, 545 So.2d 228, 230 (Ala.Cr.App.1989); Brinks v. State, 500 So.2d 1311, 1314-15 (Ala.Cr.App. 1986). `Argument by the prosecution concerning omissions and inconsistencies in the defendant's version of the case is not improper.' Salter v. State, 578 So.2d 1092, 1096 (Ala.Cr.App.1990), cert. denied, 578 So.2d 1097 (Ala.1991)."
Mosely v. State, 628 So.2d 1041, 1042 (Ala. Cr.App.1993).
"The comment at issue here `tends to focus on what the defendant did say, rather than what he did not say.' Brinks v. State, 500 So.2d 1311, 1315 (Ala.Cr.App. 1986)." Kimble v. State, 545 So.2d 228, 230 (Ala.Cr.App.1989). Both Burgess and the state relied upon the statements Burgess made to the police and the press to argue their theory of the case. The thrust of the prosecutor's argument was that Burgess lied about how he killed Mrs. Crow, and Mrs. Crow was not alive to refute the lie. It was not an impermissible comment on Burgess's right to remain silent for the prosecutor to question Burgess's truthfulness in making his statement.

X.
Burgess argues that the trial court erred by failing to instruct the jury during the sentencing phase that age could be considered a mitigating circumstance. We note that Burgess did not object to the lack of a more specific instruction on mitigating circumstances. Therefore, any error in this regard must rise to the level of plain error.
The record reflects that the trial court instructed the jury on the statutory mitigating circumstances listed in § 13A-5-51, Ala.Code 1975, including the mitigating circumstance of "age of the defendant at the time of the crime." (R. 1739-41.) It also instructed the jury that "a mitigating circumstance considered by you should be based on the evidence you heard. When factual existence of an offered mitigating circumstance is in dispute, the State will *169 have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence." (R. 1742.)
The trial court fully informed the jury of the function of mitigating circumstances in its deliberations and its option of recommending life imprisonment without parole. The court specifically instructed the jury that it could consider "age at the time of the offense" as a mitigating circumstance, if it found that mitigating circumstance to exist. The jury was presented with evidence that Burgess was 18 years old at the time of the murder and it was for the jury to consider the weight to be accorded that mitigating circumstance. The trial court is not required to specifically charge the jury that this mitigating circumstance did in fact exist. Morrison v. State, 500 So.2d 36, 47 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987).

XI.
Burgess argues that the trial court improperly instructed the jury that the court had already decided the voluntariness of Burgess's admissions to the police and the media, rather than instructing the jury that the voluntariness of the admissions was a question of fact for the jury. See Ex parte Singleton, 465 So.2d 443 (Ala.1985). Because Burgess did not object to the instruction at trial, we review this issue under the plain error rule. Rule 45A, Ala.R.App.P.
The instruction now objected to by Burgess is as follows:
"Conduct of a defendant, including statements knowingly made and acts knowingly done, upon being informed that a crime has been committed or being confronted with a criminal charge, may be considered by the jury in the light of other evidence in the case in determining guilt or innocence. Whether or not the evidence as to the defendant's voluntary explanation or statement points to a consciousness of guilt and the significance to be attached to any such evidence are matters exclusively within the province of the jury. A statement or an act is knowingly made or done if made or done voluntarily and intentionally and not because of a mistake or accident or other innocent reason. The jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."
(R. 1589-90.) We find nothing in this instruction that informed the jury that the trial court had already determined the confessions of Burgess to be voluntary. In fact, we find quite the opposite. It is clear from the instruction, read in context with the trial court's other instructions, that how the jury was to consider Burgess's statements was a matter "exclusively within the province of the jury."
The trial court's instruction "`did not misinform the jury of the law, did not affect [Burgess's] substantial rights, did not constitute prejudicial error, and therefore, did not rise to the level of plain error.'" Price v. State, 725 So.2d 1003, 1019 (Ala.Cr.App.1997), quoting Gaddy v. State, 698 So.2d 1100, 1122 (Ala.Cr.App. 1995).

XII.
Burgess next argues that the trial court erred in allowing an in-court identification that, he argues, was tainted by an unduly suggestive pretrial photograph array. The record indicates that Ms. Patricia Wallace was called as a witness to identify Burgess as the person she saw outside the bait and tackle shop as she and a coworker were leaving the shop and walking back to their workplace. On examination by trial counsel, she testified *170 that she was shown a photographic array containing six photographs the afternoon of the murder, after she had telephoned the police to tell them that she remembered seeing a young black male walking toward the shop as she was leaving the shop. She picked two of the photographs from the array as resembling the person she saw. One of those photographs was of Burgess. Ms. Wallace testified that she picked that photograph because the jacket the person was wearing looked familiar and because of the shape of the face.
Burgess argues that the photographic array was unduly suggestive because he was the only person in the photographs in the array wearing a windbreaker, he was the only person photographed against a blank wall, and his photograph was the most recent photograph. Further, Burgess argues that Wallace testified that the police made it obvious that Burgess was the person they had in custody.
"A pretrial line-up is impermissibly suggestive if, under the totality of the circumstances, the procedure challenged created a `substantial likelihood' of misidentification." Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The trial court heard testimony on voir dire, outside the presence of the jury, concerning all aspects of the photographic line-up and concluded that the procedures followed were not impermissibly suggestive. After carefully reviewing the testimony and the set of photographs preserved in the record, we agree. Frazier v. State, 528 So.2d 1144, 1149 (Ala.Cr.App. 1986). We note that, while six photographs were admitted into evidence by defense counsel, only four of those photographs were ultimately retained in the record, including the photograph of Burgess. The two missing photographs have apparently been lost and cannot be found by court personnel.
"On the whole, the physical appearance of [Burgess] is not so dissimilar to that of the other line-up participants that it renders the line-up unduly suggestive." Jones v. State, 450 So.2d 165, 170 (Ala.Cr. App.1983), aff'd, 450 So.2d 171 (Ala.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 232, 83 L.Ed.2d 160 (1984). While it is true that Burgess was the only person in the photographs wearing a jacket, the photographs were all "head and shoulder" pictures, and it was impossible to ascertain what sort of jacket, other than its color, Burgess was wearing. All the photographs depicted young black males of approximately the same age, same build, same hair color and style, and same complexion. That Burgess was wearing a dark jacket or that Burgess was standing before a blank wall while the others were standing in front of a curtain did not render the photographic array unduly suggestive. Edwards v. State, 574 So.2d 864, 867 (Ala.Cr.App.1990). There is nothing in the record to suggest that the fact that Burgess's photograph was a recent photograph influenced Ms. Wallace's identification. Nor is there any evidence in the record that the police indicated to Ms. Wallace that Burgess was the person who was in their custody.
However, even if Ms. Wallace's in-court identification of Burgess was somehow tainted by either the photographic array or by Ms. Wallace's having seen Burgess on television, we are convinced that the trial court's decision to allow the in-court identification, if error, was harmless error.
In determining whether the admission of improper testimony is reversible error, this court must determine whether the "improper admission of the evidence ... might have adversely affected [Burgess's] right to a fair trial," and before we can affirm a judgment based *171 upon the "harmless error" rule, we must find conclusively that the trial court's error did not affect the outcome of the trial or otherwise prejudice a substantial right of Burgess. Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993). In this case, the identification of Burgess as the person who entered the bait and tackle shop and ultimately murdered Mrs. Crow was never in issue. The evidence was overwhelming that Burgess robbed and shot Mrs. Crow. Burgess was apprehended while driving Mrs. Crow's car and when he was apprehended he was in possession of the weapon used to shoot Mrs. Crow. He confessed to the police and to the news media that he was the person who had committed the robbery and murder. Although his theory of defense may have been affected by the evidence admitted at trial, Burgess focused on whether he had the intent to kill; his lawyers argued to the jury that he had committed only a felony murder, because, they argued, the shooting was committed during the robbery and was accidental. Thus, there was no prejudice to Burgess at all that Ms. Wallace was allowed to identify him as the person she had seen near the bait shop the morning of the robbery and murder. We are convinced beyond a reasonable doubt that, if admission of the identification evidence was error, it was harmless error. Chapman v. State of Cal., 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

XIII.
Burgess argues that his arrest was illegal and that, therefore, all evidence and statements taken from him as a result of that arrest should have been suppressed. Specifically, he argues that the police lacked probable cause when they issued a BOLO ("be on the lookout") for Mrs. Crow's automobile. That BOLO resulted in Madison police officers stopping the car that Burgess was driving. Burgess argues that the police did not know whether Mrs. Crow's car had actually been stolen when they issued the BOLO, and that they were acting on suspicion only. He argues that those suspicions could not elevate a lack of evidence concerning the stolen car into probable cause to support a warrantless arrest.
The evidence shows that, upon arrival at the bait and tackle shop, Decatur police investigators determined that Mrs. Crow's 1989 gray Pontiac Grand Am automobile had been at the shop earlier in the day, but was no longer there. (R. 1007-10.) The police conducted a records check and discovered the automobile's tag number. The Decatur police department then released a BOLO, advising area police departments that there had been a robbery and a homicide at the Decatur Bait and Tackle Shop and that the victim's automobile was missing, and giving the description and tag number of the car. (R. 997-1002.) This information led the Madison police to patrol the interstate spur through Madison and to discover the gray Pontiac travelling towards Huntsville, and, ultimately, to make a felony traffic stop of the automobile.
"`[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, see United States ex rel. Kirby v. Sturges, 510 F.2d 397, 400-401(CA7)(Stevens, J.), cert. denied, 421 U.S. 1016, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975), to pose questions to the person, or to detain the person briefly while attempting to obtain further information. See Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).'
*172 "United States v. Hensley, 469 U.S. 221, 232, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)." Ex parte Windsor, 683 So.2d 1042, 1052 (Ala.1996).
The evidence indicates that, based on their preliminary investigation, the Decatur police had sufficient reason to believe, beyond mere suspicion or "gut feeling," that Mrs. Crow's car had been present at the shop before the robbery and murder, and that it was missing following the robbery and murder. Thus, they properly warned other police agencies to be on the lookout for Mrs. Crow's Pontiac automobile, in connection with the robbery and homicide. With that information, the Madison police clearly had a reasonable suspicion to stop the gray Pontiac Grand Am automobile with the tag number reported in the BOLO. Reasonable suspicion for a particular stop is determined by considering the totality of the circumstances, as known to the officer at the time of the stop. State v. Washington, 623 So.2d 392, 395 (Ala.Cr.App.1993). Upon stopping the automobile and removing both Burgess and his girlfriend from the car, the police then discovered a pistol under Burgess's seat and a large amount of money in his back pocket. Therefore, at the time Burgess was arrested, which was shortly after the robbery/murder, police discovered him driving the victim's automobile, while in possession of a pistol and a large sum of money. The question then becomes, was that sufficient information to supply the police with probable cause to make a warrantless arrest?
"`Police officers may arrest an individual without a warrant if a felony has been committed and they have reasonable cause (probable cause) to believe that the person arrested committed this felony. [§ 15-10-3(3), Ala.Code 1975]. A police officer has probable cause to arrest when he has knowledge of circumstances such as would lead a reasonable man of ordinary caution, acting impartially, reasonably, and without prejudice, to believe the person arrested is guilty. Swicegood v. State, 448 So.2d 433, 434 (Ala.Cr.App.1984). In determining whether [the police] had probable cause to arrest the defendant, the court must deal with probabilities which are not technical, but factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, would act. United States v. Seay, 432 F.2d 395 (5th Cir. 1970). Probable cause does not mean a sufficient quantum of evidence to support a conviction. McCants v. State, 459 So.2d 992, 994 (Ala.Cr.App.1984).'"
Powell v. State, 548 So.2d 590, 596-97 (Ala. Cr.App.1988), aff'd, 548 So.2d 605 (Ala. 1989), quoting the trial judge's order. In this case, we believe that the fact that the police found Burgess driving the victim's automobile within a short time after she had been robbed and killed, in possession of a pistol and a large sum of money, was more than sufficient to provide probable cause for a warrantless arrest. Knotts v. State, 686 So.2d 431, 463 (Ala.Cr.App. 1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997).

XIV.
Burgess argues that the trial court erred in admitting into evidence the statement he made to police. Specifically, he argues that the Decatur police continued to interrogate him after he made an unequivocal request for counsel. He argues that the State did not meet its "heavy burden" to show that the statement was voluntary.
A motion hearing to suppress Burgess's statement to police was held at trial, outside the presence of the jury. At that *173 hearing Investigator Long, with the Decatur police, testified that, after Burgess's arrest, he and Investigator Tallent brought Burgess into an interrogation room at the Decatur police station. There, Long formally readvised Burgess of his Miranda[4] rights. According to Long, Burgess indicated that he understood his rights and he then waived them and agreed to make a statement. Burgess initially denied knowing anything about the robbery or murder, telling the officers that he had gotten Mrs. Crow's automobile from a person named "Soda Pop or Pop Soda." After 15 minutes, Burgess asked the investigators about his girlfriend. According to Long, when they told Burgess that she was also at the police station, Burgess said that "she didn't have anything to do with it, that he would be glad to talk with us and explain it to us, but he needed a lawyer at this time." (R. 1077.) Long testified that, at that point, the investigators stopped questioning Burgess and asked Burgess who his lawyer was and, when he did not respond, asked him if there was someone they should call for him. Burgess again did not respond. Tallent left the interview room to talk with their lieutenant. Long stated that, because Burgess was in his custody, he stayed in the interview room with Burgess, with the door open. Long testified as follows as to what happened next:
"Q [Prosecutor]: And so what occurred as you and Mr. Burgess sat there?
"A [Long]: Well, small talk. Willie told me about losing a child, just small talk between the two of us there to relieve the boredom while we were sitting there.
"Q: Was there any discussion about the case or any facts about it or anything like that?
"A: No, sir.
"Q: And were you asking Mr. Burgess these questions or was he telling you things that were going on?
"A: Just talking. No questions were asked. It was just talk, casual conversation at the time.
"Q: How long did y'all just sit there and talk in this manner before something occurred?
"A: I assume 10, 15, 20 minutes, we sat there."
(R. 1078-9.) Long then testified that he asked Burgess if he needed to use the restroom and Burgess said he did not. Long then got up and went to the open door of the interview room and got a patrol officer to watch Burgess while Long went to the restroom. When Long returned, he sat back down in the interview room with Burgess. Long testified:
"A: We were sitting there. Willie asked meif he was charged what would the charge be, and I explained to him it would be capital murder, that a crime wasa death during the commission of a crime. At this time, he asked me what the punishment was. I explained to him that in the State of Alabama capital murder was punishable by life in prison without parole or the electric chair.
". . . .
"A: At this point in time, he started to ask me something else. I don't know what it was because I didn't let him get finished. I told him, I said, `Willie, you have asked for an attorney and I cannot talk with you about the case until you get an attorney.'
"Q: Even though he had initiated these other questions, you still stopped him on like the third question or after he asked a couple of questions?

*174 "A: Yes.
"Q: After you told Mr. Burgess you couldn't talk to him anymore, then what happened?
"A: Well, he sat there for a minute or two. He said to me, `Well, it doesn't make any difference, I'm dying of brain cancer anyway. I have nothing to live for. I've lost a child.'
". . . .
"A: ... He just started talking about the crime and that he had committed the crime, and basically went through the whole thing from the time that he got up that particular morning until the time that he was stopped in Madison by the Madison Police Department.
". . . .
"Q: ... [W]ere you asking him any questions?
"A: No, sir.
"Q: Did you encourage him to tell you anything or threaten him in any way if he stopped or anything like that when he was telling this story after he made this statement?
"A: No, sir.
"Q: You just sat there and listened to him, is that correct?
"A: Yes, sir."
(R. 1080-82.) Long testified that after Burgess had told him what had happened, he asked Burgess if he could write it down. When Burgess agreed, another investigator was called in and took down Burgess's statement as Burgess related it to her. This statement was written on a Decatur Police Department form that again advised Burgess in writing of his Miranda rights. After reviewing the form and the written statement, Burgess signed the statement. (R. 1087-88.)
Burgess testified during the motion hearing that, after he asked for an attorney, the police refused to let him have access to one, telling him he had already waived his rights. Burgess testified that, when he insisted on seeing a lawyer, investigator Tallent stood behind him, pressed his hands down on Burgess's shoulders and slapped the hat off of Burgess's head, saying, "You're not in juvenile small time, you're in the big boys." Burgess claimed that he made a statement as a result of this treatment. (R. 1131-35.) The trial court, apparently discounting Burgess's version of events, admitted the statement, ruling:
"[W]e have a defendant who has ... invoked his Miranda right to counsel, and the court determines here that the defendant initiated the further conversations with Officer Long, and then also others, particularly Officer Moore. That the defendant initiated this subsequent conversation or communication with the police and made a clear desire to discuss the criminal investigation.
"The court looks at the particular facts and circumstances in this case, and it's significant here that the accused, not the policesignificantinitiated this subsequent dialogue, and the court is satisfied and finds that the defendant knowingly and intelligently waived his right to counsel, and that he initiated a conversation initiated the communication with the police, indicating a desire to discuss the criminal investigation. And the court is satisfied that his subsequent statements were voluntary and followed a knowing waiver of his right to remain silent. We look at that under the totality of the circumstances and that it was the accused, not the police, who reopened the dialogue, and we're satisfied that the defendant's right which earlier he had exercised to cut off the questioning, that his rights and his Miranda rights and other rights were scrupulously honored ... in this case."
(R. 1212-13.)
"In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the *175 United States Supreme Court held that police officers must immediately cease interrogating a suspect who has clearly asserted his right to have an attorney present during custodial interrogation and that interrogation may not resume unless the suspect initiates and consents to further questioning." Ex parte Cothren, 705 So.2d 861, 863 (Ala.1997), cert. denied, 523 U.S. 1029, 118 S.Ct. 1319, 140 L.Ed.2d 482 (1998). Alabama courts have consistently applied Edwards and have held that statements made in violation of an appellant's right to counsel are inadmissible. In Arthur v. State, 575 So.2d 1165, 1172 (Ala.Cr. App.1990), cert. denied, 575 So.2d 1191 (Ala.1991), this court stated:
"[T]he prosecution ha[s] the `heavy burden' of overcoming the presumption, which was raised by [the defendant's] request for counsel, that [he] considered himself unable to deal with the pressures of custodial interrogation without legal assistance. `[The] discomfort [with the pressures of custodial interrogation] is precisely the state of mind that Edwards presumes to persist unless the suspect himself initiates further conversation about the investigation....'"
See also O'Shields v. State, 689 So.2d 227, 230 (Ala.Cr.App.1996).
The United States Supreme Court has provided some guidelines regarding the definition of both "interrogation" and "initiation." In Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court held that the rationale of Miranda prohibited not only express questioning by the police, but also its "functional equivalent." "[A]ny words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" are the functional equivalent of an interrogation. 446 U.S. at 301, 100 S.Ct. 1682. The Supreme Court included such actions as "the use of psychological ploys, such as to `posi[t] the guilt of the subject,' to `minimize the moral seriousness of the offense,' and `to cast blame on the victim or on society'" as the functional equivalent of an interrogation. 446 U.S. at 299, 100 S.Ct. 1682.
In Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Supreme Court defined "initiation" as an inquiry that can be "fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." 462 U.S. at 1045, 103 S.Ct. 2830.
The question here is whether the continued conversation between Burgess and investigator Long amounted to the functional equivalent of an interrogation. We think not. There is no evidence in the record to suggest that Long's "small talk" with Burgess was a psychological ploy that Long should have realized would result in an incriminating response by Burgess. As Justice Powell noted in his concurring opinion in Edwards, there is a difference between "custodial interrogation" and "custodial conversation:"
"Communications between police and a suspect in custody are common-place. It is useful to contrast the circumstances of this case with typical, and permissible, custodial communications between police and a suspect who has asked for counsel. For example, police do not impermissibly `initiate' renewed interrogation by engaging in routine conversations with suspects about unrelated matters."
451 U.S. at 490, 101 S.Ct. 1880. The United States Supreme Court held in Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), that in the absence of "compelling influences, psychological ploys, *176 or direct questioning," the "possibility" that an accused will incriminate himself, even the subjective "hope" on the part of the police that he will do so, is not the functional equivalent of interrogation. 481 U.S. at 528-29, 107 S.Ct. 1931.
We find that Burgess initiated further conversation about the murder/robbery investigation when he asked Long about the charges against him and the possible punishment. We do not find that Long's straightforward answers to those questions were a "compulsion, ploy, or artifice" to prompt an incriminating response from Burgess. Indeed, Long cut off Burgess's questions by reminding him that he had asked for a lawyer and that he was not free to discuss the matter with Burgess. Burgess's subsequent decision to make an incriminating statement was not the result of continued interrogation, but a voluntary initiation of the discussion of the murder/robbery.[5] If there was a subsequent reinterrogation by the police when Long brought in another investigator to take down Burgess's written statement, it is clear from the signed and initialled form on which the statement was written that Burgess was again readvised of, and waived, his Miranda rights after he initiated the conversation. See Oregon v. Bradshaw, 462 U.S. at 1044, 103 S.Ct. 2830. The trial court did not err, therefore, in admitting into evidence Burgess's voluntary statement to police.

XV.
Burgess argues that the trial court erred in not suppressing all the evidence seized, as well as his subsequent statements, as a result of his arrest in Madison, because, he says, the Decatur police violated his "due process rights" when they did not comply with the provisions of § 15-10-70, Ala.Code 1975.
Section 15-10-70, Ala.Code 1975, states, in pertinent part:
"When any person charged with the commission of any offense is arrested in any county other than that in which he is triable by an officer of the county in which he is arrested, such arresting officer shall immediately commit him to a jail or guardhouse nearest to the place of arrest, and the sheriff of such county shall at once notify the sheriff of the county in which such person is triable of the fact of such arrest and confinement."
We will assume, without deciding, that Burgess was arrested by the Madison police officers who stopped the automobile he was driving, even though Decatur police officers were on the scene within minutes of the traffic stop. This issue was decided in Borden v. State, 769 So.2d 935, 942 (Ala.Cr.App.1997), where a fugitive from Lawrence County was found to have been properly arrested in Morgan County. As we held in Borden, we find that a failure to comply with the procedural requirements of § 15-10-70 did not render Burgess's initial arrest illegal. Burgess has not established any nexus between the physical evidence seized, or any subsequent statement he made after the arrest, and the state's alleged failure to comply with § 15-10-70. Any failure to comply with the statute simply was not of "constitutional proportions." Borden v. State, supra.

XVI.
Burgess argues that the trial court erred in not suppressing the statement he made to news reporters the night of his arrest and that was videotaped. *177 Burgess argues that, because he asked for an attorney, the police "knowingly subjected [him] to the highly charged and provocative atmosphere of the media circus," which, he argues, the police should have known would elicit an incriminating response, in violation of his Miranda rights. See Rhode Island v. Innis, supra.
Because we have already determined that, before meeting the press, Burgess initiated contact with investigators after requesting an attorney, and that he subsequently waived his Miranda rights and provided the police with a written statement, we do not find Burgess's subsequent statement to the press to have violated his right to remain silent, or his right to have an attorney present.
However, even if Burgess had not initiated his discussion with police investigators about the murder/robbery and then waived his rights and made a statement, we would not find his subsequent interview with the press to be a violation of those rights. Having reviewed the record and the videotape of Burgess's statement to the media, we find no evidence of police complicity with the press or of some coercion on the part of the police which persuaded Burgess to speak to the press. The videotape does not portray a "media circus" or a "highly charged and provocative atmosphere." When Burgess and his police escort stepped out of the doors of the police station to walk to the county jail, they were met by a group of reporters and at least one television videographer. A reporter asked Burgess if he had anything to say, and in response, Burgess very calmly and articulately talked and answered reporters' questions nonstop until the door closed behind him at the jail. There is not a shred of evidence that he was overcome by the situation, or that he was compelled to speak to the press. Neither police escort asked him any questions, nor did they propose any questions for the press to ask. (Lack of police involvement in the press interview is also what differentiates this case from Rideau, supra.)
Miranda applies in situations involving a police interrogation and custody. Miranda v. Arizona, supra. There is simply no evidence here that the police manipulated either Burgess or the media in such a way as would result in the "functional equivalent of interrogation." Nor was there any evidence that the Decatur police were avoiding their duty under Miranda by attempting to have the press act as their agent in order to bypass the Miranda requirements. There must be some evidence of an agency relationship between the media and the police in order to conclude that the media, in a case such as this one, was acting as an agent for the police. Sears v. State, 668 N.E.2d 662, 668-69 (Ind.1996).
We conclude that the trial court properly admitted into evidence the videotaped statement Burgess gave to the news media.

XVII.
Burgess next argues that the trial court erred in denying his requests for continuances. On June 7, 1994, less than two weeks before his trial, Burgess filed a motion for continuance, stating that trial counsel "cannot properly prepare the case for trial by June 20th." The trial court denied the motion on June 10, 1994. On June 20, 1994, the day set for trial, Burgess filed in open court a second motion for continuance. His attorneys noted that, although they had been appointed to represent Burgess on July 28, 1993, they had been notified that the case was set for trial less than a month earlier. Counsel averred that although they felt that they were not adequately prepared to proceed with a penalty phase at that time, that *178 they could proceed in this case because, as one counsel stated, "I've tried so many of them. I guess I could do an adequate job." Counsel reiterated that he did not feel comfortable proceeding with the trial, especially because his investigator was having trouble getting some sentencing witnesses Burgess had told them about, as well as some family members, to cooperate.
In denying the second motion for continuance, the trial judge noted that in January 1994, he had granted a speedy trial motion filed by Burgess and had said at that time in open court that he anticipated trying the case in March 1994. Then, when the trial judge held hearings on the change-of-venue motion in February 1994, the trial judge advised counsel that he expected the case to be docketed for trial in April or May 1994. The trial judge then noted that after he ruled on the change-ofvenue motion on April 14, 1994, the case was docketed for June. The trial judge then denied the request for continuance because he believed trial counsel had been given adequate notice of the trial date, and because of the speedy trial request made by Burgess in January. The trial court stated:
"[W] have to recognize that not only is the defendant entitled to a speedy trial, but the State or the people of the State are entitled to a speedy trial or a trial as quickly as can be accomplished.... I think that the Court owes an obligation to move as quickly and as rapidly as it reasonably can do so to get to the trial of the case, giving reasonable notice to everybody to get ready. And I think that further delay is unreasonable to the State and to the defendant, and I suspect that there's always something toward the end of the preparation stage that the State finds that it could have done ... and the defense finds [that] `there's something else I wish I could do.' ... I'm satisfied that Mr. Burgess and his counselors have had ample opportunity to prepare. I'm also satisfied that he has very trained and competent and diligent lawyers."
(R. 35-36.) After the verdict was returned and before the sentencing phase began, trial counsel asked "that the Court continue this cause and perhaps strike another jury at a later date, or at least give us until sometime in the morning to let me finish interviewing [the] sentencing witnesses that we have rounded up and try to get them back to Court." (R. 1646-47.) The trial court denied Burgess's request for a general continuance, but granted him a continuance until 9:00 a.m. the next morning before starting the sentencing phase of trial.
The decision whether to grant or to deny a motion for a continuance is committed to the sound discretion of the trial court, and such a decision will not be reversed absent a clear showing that the trial court abused its discretion. Smith v. State, 698 So.2d 189, 205 (Ala.Cr.App. 1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Burgess never indicated a specific relevant witness or any specific relevant evidence that would have been available to him if a continuance was granted. Counsel's belief that they would have been better prepared with more time is a belief shared by every trial judge and lawyer who has ever been involved in a trial. The trial court did not abuse its discretion in denying the continuances.

XVIII.
Burgess argues that "excessive security" measures taken by the trial court denied him a fair trial. Specifically, Burgess alleges that he "sat handcuffed and surrounded by numerous armed police officers *179 for over two days, while the trial court conducted voir dire" and that after he complained about the measures, "the trial court directed the sheriff's office to lighten the appearance of security and to remove the handcuffs from Mr. Burgess's wrists." These allegations have no basis in fact from the record.
The record reflects that, after voir dire examination, and just before testimony started, trial counsel commented to the trial court:
"I don't know what the purpose is exactly, but my clientwe look like we're in some kind of armed camp over here, three deputies behind us. It certainly gives the impression they're afraid that Willie is gonnaor [is] vicious or meaner than I think he is, and I know they've got a job to do. Maybe they can get somewhere else in the courtroom or something other than just that one spot, and I understand that situation, but every time the jury gets ready to leave there's somebody standing behind him with their hand on his shoulder or something."
(R. 765-66.) The trial judge responded that he had talked to the sheriff about having the defendant in the courtroom before the jury came in and "that whatever security we had, like handcuffs or whatever they're using, they get him in, get those taken off, put [them] away in somebody's pocket or something, to try to keep that not be where the jury would see that." The trial court then responded to Burgess's concern about the deputies by asking security to spread out in the courtroom, rather than lining up behind Burgess. (R. 766-67.) There is absolutely nothing in the record to suggest that Burgess was shackled or handcuffed as he sat before the jury.
We note that, before trial, Burgess had written the trial court, asking that he be provided with an armed escort to and from the courtroom, and that security measures be taken on his behalf during the trial. (C.R.158.) He cannot now complain of the trial court's attempt to comply with his security concerns. Fountain v. State, 586 So.2d 277, 278 (Ala.Cr. App.1991).
The security measures at Burgess's trial were not excessive in light of the fact that he had been indicted for capital murder.
"The trial court can best determine what security measures are necessary. `Within constitutional limits, great weight must be accorded the discretion of the trial court. The trial judge is responsible for maintaining order in his courtroom. He understands infinitely better than we what is necessary to perform his duty.' Goodwin v. State, 495 So.2d 731, 733 (Ala.Cr.App.1986)."
Windsor v. State, 683 So.2d 1027, 1033 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997).
The security measures at Burgess's trial did not deny him his right to a fair trial.

XIX.
Burgess complains that the trial court improperly defined "reasonable doubt" in his instructions to the jury. Specifically, Burgess argues that the sentence "A reasonable doubt is one for which a good reason can be given," which was a part of the reasonable doubt instruction, and the phrase, "beyond a reasonable doubt and to a moral certainty," which was a part of the instruction on direct and circumstantial evidence, resulted in an inadequate and improper instruction on reasonable doubt. Because there was no objection to the use of these words at trial, *180 we review this issue under the plain error rule. Rule 45A, Ala.R.App.P.
In reviewing a trial court's instructions, this court has consistently held that a trial court's oral charge to the jury must be viewed in its entiretynot in "bits and pieces." Parks v. State, 565 So.2d 1265 (Ala.Cr.App.1990); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988). In context, the trial court instructed the jury as follows:
"You must be convinced of the defendant's guilt after full, fair, and impartial consideration of all the evidence. In determining any issue of fact presented in the case, you should be governed solely by the evidence introduced before you. You should not indulge in speculation, conjectures, or inferences not supported by the evidence. His guilt must be proven beyond a reasonable doubt and each member of the jury must be satisfied of such. To clarify the term `reasonable doubt,' it may help you to some extent for me to say that the doubt which would justify an acquittal must be an actual doubt, not merely a guess or surmise. It should not be a mere vague, conjectural, or speculative doubt, but a reasonable actual doubt arising from the evidence and remaining after a careful consideration of all of the evidence. It is a doubt that reasonable and fair-minded men and women would entertain consciously and would entertain under all the circumstances. Note that the state is not required to convince you of the defendant's guilt beyond all doubt but simply beyond a reasonable doubt. Reasonable doubt does not mean an absolute, nonqualified positive certainty. Everything relating to human affairs and depending upon moral evidence is open to some possible or imaginary doubt. A reasonable doubt may arise from the evidence or it may arise from a lack of evidence. A reasonable doubt is one for which a good reason can be given."
(R. 1583-85.)
In Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), the United States Supreme Court condemned a jury instruction that equated reasonable doubt with "such doubt as would give rise to a grave uncertainty," with an "actual substantial doubt," and with a doubt believed to a "moral certainty"; the Court held that these definitions of reasonable doubt suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard. Burgess argues that the trial court's use of the term "good reason" substituted for the reasonable doubt standard a higher standard that would require the jury to articulate a "good reason" before Burgess could be acquitted. We do not agree. The instruction, taken as a whole, was used to explain to the jury the principle that a doubt cannot arise from speculation, surmise, or conjecture, but must be based on the evidence or a lack thereof. The trial court's instruction did not require that a juror be able to articulate a specific reason for its doubt, but rather that it be a doubt for which a reason could be recognized. The instruction to the jury made it clear that it was to render a verdict based upon a careful consideration of the evidence. Neither the use of the term "good reason" nor the reference to "moral certainty" during the trial court's instruction on circumstantial evidence misled the jury into believing that a higher or different burden of proof than "beyond a reasonable doubt" was required for its deliberations. Ex parte Taylor, 666 So.2d 73, 85 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); DeBruce v. State, 651 So.2d 599, 617-18 (Ala.Cr.App.1993), aff'd, 651 So.2d 624 (Ala.1994).
*181 The trial court correctly charged the jury on reasonable doubt, using the reference to "good reason" merely to explain reasonable doubt. The trial court's later use of the term "beyond a reasonable doubt and to a moral certainty" during another instruction was of no consequence to the jury's understanding of the trial court's reasonable doubt instruction. There is no plain error.

XX.
Burgess next argues that his sentencing was improper because, he says, the trial court inappropriately considered nonstatutory aggravating circumstances and failed to consider statutory mitigating circumstances.

A. Aggravating Circumstances.
Burgess argues that, in addition to the statutory aggravating circumstance of a murder committed during the course of a robbery found to exist by the trial court, pursuant to § 13A-5-49(4), Ala. Code 1975, the trial court also considered the following as aggravating circumstances: "lack of appreciation for human life"; a "perceived lack of remorse"; "premeditation"; and the fact that "Mr. Burgess was sane at the time he committed the crime." Burgess argues that the trial court's reliance on these "aggravating circumstances" was improper because the trial court is prohibited from considering any circumstance in aggravation that is not specifically included in § 13A-5-49, Ala. Code 1975, and because "these nonstatutory aggravating circumstances did not distinguish this [murder] from other [noncapital] murders."
Upon reviewing the entire sentencing order, we do not believe the trial court either enunciated or considered non-statutory aggravating circumstances in arriving at the sentence. We note that in the paragraph of the sentencing order labeled "Aggravating Circumstances," the trial court found the existence of one aggravating circumstancethat "the defendant committed the capital offense while he was engaged in the commission of the offense of robbery in the first degree." In the next paragraph, labeled "Statutory Mitigating Circumstances," the trial court discussed each of the mitigating circumstances defined in § 13A-5-51, and determined that Burgess's age at the time of the offense and Burgess's lack of a significant history of prior criminal activity were mitigating circumstances. The next paragraph, "Nonstatutory Mitigating Circumstances," reviews the evidence concerning Burgess's character, his family history, and his capacity to appreciate the criminality of his conduct and to conform his conduct the requirements of the law. The trial court found each of those circumstances to exist as a nonstatutory mitigating circumstance. It was within this discussion of the evidence of nonstatutory mitigating circumstances that the trial court commented on the sincerity of Burgess's show of remorse, and which included its finding that while Burgess was not incompetent, insane, or suffering from diminished capacity, he did have a personality disorder. We find that the trial court's written discussion of the facts presented at sentencing as mitigating evidence is not a finding or a consideration of nonstatutory aggravating circumstances.
In the next paragraph of the sentencing order, labeled "Weighing of Aggravating and Mitigating Circumstances, Section 13A-5-48, Code of Alabama, 1975," the trial court conducts its weighing of the circumstances. It is this discussion of the facts of the murder and the weighing of the aggravating and mitigating circumstances that Burgess claims is actually a finding of other nonstatutory aggravating *182 circumstances. That is simply not the case.
In Rutledge v. State, 523 So.2d 1087, 1103 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988), we reviewed a similar claim that the trial court's weighing of the aggravating and mitigating circumstances was actually a finding of nonstatutory aggravating circumstances. We adopt our holding in Rutledge for this case. As in Rutledge, we hold:
"It is true that the statements[6] made by the trial court in paragraph three of its sentencing order could possibly be applied to a great many capital cases; however, the facts of this case support the court's statements, which we believe are merely the court's editorial comments on the evidence presented. It is entirely proper for the trial court to consider all the facts presented by the evidence in imposing sentence. [§ 13A-5-47]. A logical reading of the sentencing order demonstrates that the trial court first made findings of the presence of aggravating circumstances (paragraph one) and then findings of mitigation (paragraph two), and then in paragraph three, he considered the facts of the case and weighed the aggravating and mitigating circumstances. Moreover, we presume that the trial court also followed the instructions it gave to the jury which charged that only the [one] designated aggravating circumstance could be considered.
"When paragraph three is read in conjunction with paragraphs one and two, it is clear to us that the trial court, in imposing the death sentence, only considered the [one] aggravating circumstance enumerated in [§ 13A-5-49(4)], which was entirely proper. We are not convinced that the contested language of paragraph three constitutes a finding by the court of nonstatutory aggravating circumstance[s]."
Reading the trial court's sentencing order in its entirety, we hold that the trial court's commentary on the premeditated nature of the offense was merely that: a commentary on the facts of the case. The court's commentary on the "inherently disturbing" nature of an "individual who is willing to kill in order to acquire the property of another" was the trial court's basis for attributing a greater weight to the aggravating circumstance listed in § 13A-5-49(4) as compared to the mitigating circumstances. His comments on Burgess's remorse and his sanity were merely discussions of nonstatutory mitigating circumstances. It would take a strained interpretation of the trial court's weighing of the aggravating and mitigating circumstances to conclude that the court improperly considered any nonstatutory aggravating circumstances.
Likewise, we decline to accept Burgess's argument that the trial court "triple counted" the aggravating circumstance that the murder was committed during the course of a robbery in sentencing him to death. Burgess argues that the trial court used that circumstance as an element of capital murder, as an aggravating circumstance, and again as the "attendant circumstances of the robbery ... considered as independent proof in aggravation of the crime."[7] *183 This claim is not supported by the trial court's sentencing order.
In the sentencing order, the trial court clearly set out the sole aggravating circumstance in this case. The language cited by Burgess reflects factors that are inherent in the aggravating circumstance that the murder was committed during a robbery. Some of the court's language also defined the nonstatutory mitigating circumstances. That language was not describing additional "attendant circumstances" but inseparable elements of the murderfactors which gave more weight to the aggravating circumstance of murder during a robbery over other mitigating circumstances. The meaning attributed by Burgess to the language in the trial court's order is strained and unrealistic. The trial court did not "triple count" the circumstance that the murder was committed during a robbery.

B. Mitigating Circumstances.
Burgess argues that the trial court erred in not giving "full recognition and consideration [to] any and all factors mitigating in favor of life imprisonment without parole." Specifically, he argues that he presented evidence of seven mitigating circumstances: (1) his age at the time of the crime; (2) his lack of a significant criminal record; (3) character evidence showing he had no history of violence; (4) his impoverished childhood; (5) the lack of a father figure in his life; (6) his lack of education; and (7) his remorse. Additionally, Burgess claims he also presented mitigating evidence that he had suffered a serious head injury as a teenager; that he believed he was dying of brain cancer at the time of the crime; and that his girlfriend had miscarried their child the day before the crimeall of which Burgess claims the trial court ignored as mitigating circumstances. Burgess argues that the trial court did not properly consider all evidence of his mitigating circumstances and, as to the evidence it did find mitigating, gave insufficient weight to those mitigating circumstances, thus depriving him of a reliable sentence. We do not agree.
In Ex parte Hart, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), the Alabama Supreme Court set out the requirements for a trial court's consideration of mitigating circumstances:
"`It is not required that evidence submitted by the accused as a nonstatutory mitigating circumstance be weighed as a mitigating circumstance by the trial judge. Mikenas v. State, 407 So.2d 892, 893 (Fla.1981), cert. denied, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982).
"`"Although consideration of all mitigating circumstances is required by the United States Constitution, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the decision of whether a particular mitigating circumstance in sentencing is proven and the weight to be given it rest with the judge and the jury. Lucas v. State, 376 So.2d 1149 (Fla.1979)." Smith v. State, 407 So.2d 894, 901 (Fla.1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982).'"
612 So.2d at 542.
From the sentencing order, it is clear that the trial court understood its duty to consider all the statutory and nonstatutory mitigating circumstances. The trial court set out each of the statutory aggravating and mitigating circumstances and indicated whether it found that circumstance to *184 exist. The trial court then extensively reviewed mitigating evidence offered during the sentencing phase of trial, and found the existence of three nonstatutory mitigating circumstances. The trial court then weighed the aggravating and mitigating circumstances, and found the aggravating circumstance to outweigh the mitigating circumstances, explaining its rationale in each instance. It is this explanation of the weighing process with which Burgess now disagrees.
"There is no doubt that the trial court considered mitigating circumstances, and the sentencing order clearly sets out which mitigating circumstancesboth statutory and nonstatutorywere considered and weighed against the aggravating circumstance. The court need not set out in its sentencing order each and every nonstatutory mitigating circumstance offered by the defendant; it merely needs to set out whether he found any nonstatutory mitigating circumstances, and if so, what those were."
Slaton v. State, 680 So.2d 879, 907 (Ala.Cr. App.1995), aff'd, 680 So.2d 909 (Ala.1996).
Our review of the mitigating circumstances shows that the trial court did not abuse its discretion in determining what evidence it found to be mitigating, and upon weighing those circumstances against the aggravating circumstance, finding that the aggravating circumstance outweighed the mitigating circumstances.
The evidence that Burgess had suffered a head injury as a teenager, that he thought he was dying of brain cancer, and that his girlfriend had suffered a miscarriage was never offered to the trial court as mitigating evidence. On appeal, Burgess has gleaned this information from other parts of the record. We do not believe the trial court, in determining the existence of nonstatutory mitigating circumstances, has the obligation to search the record for bits and pieces of information that was neither offered nor argued as a basis for a sentence of life imprisonment without parole. § 13A-5-52, Ala.Code 1975. No error exists on this issue.

XXI.
Burgess argues that blacks were systematically excluded from the jury rolls of Morgan County, violating his Sixth Amendment right to a petit jury selected from a fair cross section of the community. Burgess bases his argument on the statistical disparity between the percentage of blacks who were eligible for jury service in Morgan County and the percentage of blacks on the jury master list and the percentage actually seated.
The record reflects that Ms. Toy Mitchell, clerk of the Morgan County jury commission, testified at trial concerning demographics for both the venire and the county. She testified that for the term of court at which Burgess was tried, she summoned 248 potential jurors, 13 of whom were black. Of these 248 jurors, 200 were summoned from the master jury list of Morgan County by the Administrative Office of Courts in Montgomery, and the other 48 jurors were jurors who had been deferred from prior court terms. Of these 48 jurors, 5 were black. Ms. Mitchell further testified that of the 248 jurors summoned, 43 of them, one of whom was black, were excused and their service deferred to another term of court. Excluding the 43 jurors who were excused and those jurors who did not report for service, 109 jurors reported for that term of court. Of those 109 jurors, Ms. Mitchell testified that she excused 6 additional jurors, none of whom were black, leaving 103 jurors who were brought into the courtroom. The trial court then disqualified one juror and excused three more, *185 one of whom was black and who was excused for health problems.
According to the record, the jury pool consisted of 99 individuals, seven of whom were black. Ms. Mitchell testified that of the 248 jurors originally summoned, 95% were white and 5% were black. Seven percent of the 99 jurors remaining on the venire were black. Ms. Mitchell further testified that, based on census information provided to her by the Wheeler Basin Regional Library, 89.9% of the population of Morgan County was white and 10.1% was black. However, blacks over 19 years of age and eligible for jury service made up only 7.2% of the county population. This information was provided to Ms. Mitchell by the Administrative Office of Courts.
The record reflects that after veniremembers were excused for various problems caused by sequestration, 84 members were left on the venire. The trial court then instructed Ms. Mitchell to randomly select 54 of the 84 jurors to serve on the venire in Burgess's trial. Ms. Mitchell testified that she randomly selected 54 jurors, two of whom were black. Those two veniremembers were then removed for cause.
The test to determine whether the fair cross-section requirement of the Sixth Amendment to the United States Constitution has been violated is as follows:
"`In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.' Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)."
Pierce v. State, 576 So.2d 236, 241 (Ala.Cr. App.1990), cert. denied, 576 So.2d 258 (Ala. 1991).
Burgess has the burden of establishing a prima facie case of a "fair cross-section" violation. Rayburn v. State, 495 So.2d 733 (Ala.Cr.App.1986). He has failed to meet this burden. "The mere recitation of the percentage disparity between the population of blacks in [Morgan] County and the number of blacks on the jury venire is not sufficient to allow us to conclude that blacks were not fairly represented on this jury venire." Stewart v. State, 730 So.2d 1203, 1238 (Ala.Cr.App. 1996).
"[E]ven if [Burgess] had demonstrated that blacks were underrepresented on the jury venire, he failed to show that this was due to the systematic exclusion of blacks in the selection process of the jury venire list. [Burgess] presented no evidence that blacks were systematically excluded from the jury venire list in [Morgan] County. `The United States Constitution "does not require an exact proportion between the percentage of blacks in the population and those on the jury list. What is required is that no qualified person can be excluded from jury service."' Pierce [v. State] 576 So.2d [236] at 241-42 [(Ala.Cr.App. 1990)], quoting Jackson v. State, 549 So.2d 616, 619 (Ala.Cr.App.1989)."
730 So.2d at 1238.
Because Burgess has failed to prove that blacks were underrepresented on his jury venire due to a systematic exclusion of blacks in the jury selection process, his claim is without merit. Ex parte Land, 678 So.2d 224, 244 (Ala.1996), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d *186 224 (1996); Burleson v. City of Daphne, 599 So.2d 1251, 1252 (Ala.Cr.App.1992).
Burgess also argues that when the trial court ordered the clerk of the jury commission to randomly reduce the venire from 99 members to 54, he was denied his right to be present at all critical phases of his trial because that random selection of the 54 veniremembers was not done in open court. Rule 9.1, Ala.R.Crim.P., acknowledges a defendant's right to be present at every stage of the trial, including the selection of a jury. Because Burgess did not raise this issue at trial, we review it under the plain error rule. Rule 45A, Ala.R.App.P. Burgess cites no authority for his claim that he had a right to be present when the clerk randomly reduced the venire.
In Windsor v. State, 683 So.2d 1021, 1026 (Ala.1994), the Alabama Supreme Court held that it was not error for the trial judge to delegate to other court officials the authority to excuse jurors or for that other official to excuse potential jurors outside the defendant's presence prior to trial. That is, in essence, what occurred in this instance. On the trial court's order, the clerk of the jury commission took the names of the 99 veniremembers and randomly reduced the number to 54. She did this as part of her duties as the clerk of the Morgan County jury commission. We find that this manner of reducing the jury venire is a purely ministerial function of the court.
"Because the basis of the right to be present at trial is the constitutional mandate [that one be provided] an opportunity to defend oneself, due process requires that the defendant be personally present `to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" Finney v. Zant, 709 F.2d 643, 646 (11th Cir.1983), quoting Snyder v. Massachusetts, 291 U.S. 97, 107-8, 54 S.Ct. 330, 78 L.Ed. 674 (1934). The culling of an overcrowded venire by a clerk of the court is not such a situation. Burgess had no more right to be present at the random selection of veniremembers by the clerk of the county jury commission than he did to be present when the Administrative Offices of Court drew up the master jury lists. The trial court did not err in allowing the random selection to be conducted out of Burgess's presence.

XXII.
Burgess argues that his trial was impermissibly "infected" by victim impact evidence admitted during the guilt phase of the trial. Specifically, Burgess complains on appeal that the victim's husband was introduced to the jury before trial and was allowed to sit at counsel table during the trial. He also complains that the victim's husband was allowed to testify about irrelevant matters or matters not contested and was used to identify and to introduce a photograph of the victim taken before her death. Because there was no objection at trial to any of these matters, we review it for plain error only. Rule 45A, Ala.R.App.P.
Burgess's argument concerning Mr. Crow's sitting at counsel's table, his being identified at court, and his being exempt from the operation of the rule of court that witnesses not be allowed to remain in the courtroom has been previously addressed by this court:
"The presence of a victim seated at the counsel table for the prosecution is specifically provided for by `The Alabama Crime Victims' Court Attendance Act,' codified at §§ 15-14-50 et seq., Ala. Code 1975. This act gives victims of a criminal offense the right to be present in the courtroom and seated alongside *187 the prosecutor during the trial of the individual charged with that offense.
"... [T]his court [has] specifically rejected the notion that the seating of the victim's widow[er] at counsel table for the prosecution violated any constitutional rights of the accused.... [I]n Anderson v. State, 542 So.2d 292, 304-5 (Ala.Cr.App.1987) ... [we held:]
"`furthermore, under § 15-14-55, Code of Alabama (1975), "a victim of a criminal offense shall be exempt from the operation of rule of court, regulation, or statute or other law requiring the separation or exclusion of witnesses from court in criminal trials or hearings." Under § 15-14-56(a), "[w]henever a victim is unable to attend such trial or hearing or any portion thereof by reason of death ... the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article."'"
Henderson v. State, 583 So.2d 276, 285-86 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).
As to Mr. Crow's testimony at trial, other than the fact that he was the victim's husband, it was not victim impact evidence. Mr. Crow testified who owned the car Burgess stole and was driving when he was arrested, the approximate amount of money stolen from the cash register, and the fact that the door to the bathroom where Mrs. Crow was murdered did not lock. This was all relevant, admissible evidence. As to Mr. Crow's identification of a pre-death photograph of Mrs. Crow, that subject has also been decided adversely to Burgess. Jolly v. State, 395 So.2d 1135 (Ala.Cr.App.1981). In Jolly, citing McElroy's Alabama Evidence, this court held:
"`It generally is agreed that the photograph of the victim of the homicide, taken before the alleged murder, is admissible for the purpose of identification. This is usually admitted in connection with the testimony of a witness who saw the alleged deceased at the time of the killing and who is called upon to identify the deceased as the person in the photograph. The foregoing decisions which admit the victim's photograph into evidence for the purpose of identification are applicable even though there exists no dispute over the identity of the deceased. (citing Luschen v. State, 51 Ala. App. 255, 284 So.2d 282 (1973)(not error to introduce "angelic" looking picture of deceased); Boyd v. State, 50 Ala.App. 394, 279 So.2d 565 (1973); Sanders v. State, 202 [Ala.App.] 37, 202 Ala. 37, 79 So. 375 (1918)).'"
395 So.2d at 1142.
The trial court did not commit plain error in allowing Mr. Crow to sit at the prosecutor's table, and to be identified to the venire, nor did it err in allowing Mr. Crow's testimony at trial, including the introduction of a photograph of Mrs. Crow.
Burgess also argues that, during sentencing argument, the prosecutor impermissibly played upon the sympathies of the jury when he argued:
"I cannot imagine what it's like to lose a loved one in your immediate family under any circumstances. It's got to be a horrible tragedy if it's a car wreck or killed in the military service, a police officer shot in the line of duty. But I double can't imagine what it must be like to lose a loved one in a senseless killing such as this.
". . . .
"Can you imagine what it must be like to go to that business up there? What must it be like every day? Every time *188 somebody in the family accomplishes something or there's a reunion or just some family event, what is the first thing you think is on their mind? `Sure wish Louise could have been here. She sure would have gotten a kick out of this.'
"What's it worth to a family to have and I'm not talking about the individual details of this family because that wouldn't be admissible in this case. But any time you snuff out somebody's life and they've got relatives and family and friends. What's it worth to a family when a grandparent gets to see a kid goor a parent goes to a ball game and sees his kid hit a home run? Or make a big play? What do you think it's like for the rest of them when they know, `Wouldn't Louise like to have seen this?'"
Because Burgess made no objection to this argument at trial, we review this allegation of improper prosecutorial argument for plain error only.
"Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397 (Ala.Cr.App.1978), and we will not reverse the trial court on that issue unless there has been an abuse of that discretion, Miller v. State, 431 So.2d 586 (Ala.Cr.App.1983). The prosecution, as well as the defense counsel, has the right to present its impressions from the evidence, and may argue every matter of legitimate inference that can be reasonably drawn from the evidence. Sanders v. State, 423 So.2d 348 (Ala.Cr. App.1982)."
Gentry v. State, 689 So.2d 894, 905 (Ala.Cr. App.1994), rev'd on other grounds, 689 So.2d 916 (Ala.1996). In reviewing claims of improper prosecutorial argument, the comments of the prosecutor must be evaluated in the context of the whole trial. Duren v. State, 590 So.2d 360, 364 (Ala.Cr. App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).
Burgess correctly points out that the prosecution offered no testimony concerning the effect Mrs. Crow's death had on her family, even though such testimony would have been admissible under Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). However, viewing the prosecutor's argument in its totality, we conclude that the prosecutor was not arguing facts not in evidence, but that he was merely reminding the jury of the impact that the death of any family member has on those left behind. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and, in particular, [her] family." Payne v. Tennessee, 501 U.S. at 824, 111 S.Ct. 2597, citing Booth v. Maryland, 482 U.S. 496, 517, 107 S.Ct. 2529, 96 L.Ed.2d 440 (White, J., dissenting).
"It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [Burgess] did not receive a fair trial simply because the jurors were told what they probably had already suspectedthat [Mrs. Crow] was not a `human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. at 838, 111 S.Ct. 2597.)" *189 Ex parte Rieber, 663 So.2d 999, 1006 (Ala. 1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995).
We note that the trial court instructed the jury that "statements and arguments made by counsel are not evidence" and that they "should disregard any remark or statement or argument which is not supported by the evidence or by the law as given to you by the court." (R. 1540.) Applying the law to the facts surrounding this argument, we find no error in the prosecutor's argument, plain or otherwise.

XXIII.
Burgess argues that the trial court erred in refusing to give three requested instructions during the guilt-phase jury instructions. He argues that these instructions were correct statements of the law and that the underlying principles of those statements were not adequately covered in the court's instructions. He argues that, without these instructions, the jury was not adequately informed of the defense that he accidentally shot Mrs. Crow during the commission of a robbery.
The trial court refused defense requested instruction no. 9, which reads as follows:
"I charge you, members of the jury, that you must find Willie Burgess, Jr., guilty of murder, and not capital murder, if you believe that he intended to commit the robbery but did not intend to commit the murder. The intent to commit the murder cannot be inferred or presumed by his use of the deadly weapon during the robbery."
The trial court correctly instructed the jury that the fact that Burgess was armed with a deadly weapon was not sufficient to convict him of murder. It further instructed that, while intent to commit murder may be presumed from the defendant's act of using a deadly weapon, the presumption will not support the conviction of capital murder; that the intent to kill Mrs. Crow must be real and specific in order to invoke the capital statute. The trial court then gave complete and correct instructions on the elements of capital murder and felony murder. (R. 1595-1601.) Thus, the written requested jury instruction was substantially given in the court's oral charge to the jury. No error occurred in the court's refusal of the above requested charge. As Rule 21.1, Ala. R.Crim.P., states, in part:
"The refusal of a requested written instruction, although a correct statement of the law, shall not be cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's oral charge or in other charges given at the request of the parties."
"A refusal to give a requested written instruction can be error only if the same principles are not substantially covered in the court's oral charge to the jury." Hunt v. State, 642 So.2d 999, 1017-18 (Ala.Cr. App.1993), aff'd, 642 So.2d 1060 (Ala.1994) (citations omitted).
Burgess also argues that the trial court erred in not giving the following two instructions:
"I charge you, members of the jury, that if you believe the signed statement of Willie Burgess, Jr., introduced in this case then you must find him not guilty of capital murder.
"I charge you, members of the jury, that if you believe the statement made by Willie Burgess, Jr., to the press as he was escorted to jail, then you must find him not guilty of capital murder."
When Burgess objected to the trial court's refusal to give those two instructions, the trial court responded:

*190 "The charges ... that [were] submitted this morning and that I refused to give, I think ... could be rather confusing. They're so broad that [the first instruction] says, `If you believe the signed statement'and really I think of course here we're referring to a portion of the signed statementbut that charge says `if you believe the signed statement introduced in this case you cannot find him guilty of capital murder.' [The second instruction] somewhat, I had the same problem with.... I just thought it was so broad.
". . . .
"... It just appeared to me it was so broad that it might be confusing. For that reason I decided I would not give it."
(R. 1618-19.) The trial court was correct. When requested charges are either fairly and substantially covered by the trial court's oral charge or are confusing, misleading, not predicated on a consideration of the evidence, argumentative, abstract, a misstatement of the law, or contain misspelled or misused words that would tend to confuse the jury, the trial court may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787, 789 (Ala. 1986). In truth, the jury could have believed most of Burgess's statement and still have convicted him of capital murder. The trial court knew that giving those instructions would only confuse the jury concerning how it could consider the statements made by Burgess to the police and to the press. Charges should be prepared with nonlawyers in mind, because the jurors who must understand and apply them are usually not lawyers. Eatmon v. State, 575 So.2d 142, 144 (Ala.1990). It was clear to the trial court what Burgess meant that if you believed Burgess's account of how Mrs. Crow was shot, then you did not believe that he was guilty of capital murder but the language in the instructions did not expressly state that principle. The proposed instructions were fatally broad and confusing, and the trial court correctly refused to give the charges. The trial court fairly instructed the jury on the consideration of evidence and the elements necessary to convict Burgess of capital murder or felony murder. The jury was therefore properly informed as to how to consider the defense theory of the case in its deliberations.

XXIV.
Burgess next argues that a cautionary instruction given by the trial court before the introduction of photographs of the crime scene showing Mrs. Crow's blood-covered body was error. He argues that the instruction "improperly suggested that the photographs were disturbing and offensive" and that by injecting into the proceedings the trial court's opinion that the photographs were gory, the court encouraged the jury to consider them gruesome. Our review of the record indicates that trial counsel did not object to this instruction; we review the issue for plain error only.
Prior to admitting into evidence five crime-scene photographs, the trial court cautioned the jury:
"Ladies and gentlemen, I determined that certain photographs here are admissible for your viewing, determining that they're relevant to the issues in this case. These exhibits, these photographs, may to some degree be disturbing or offensive to some people or to your sensibilities. If so, I instruct you that you should not allow such feelings to influence your deliberations on the question of the defendant's innocence or guilt. To do so would be improper. These exhibits may be considered by you solely for the purpose of resolving material issues of fact. I'll allow you to see these exhibits, these photographs, *191 because I believe that each exhibit independently may be of some assistance to you in understanding the facts of the case."
(R. 847.)
"The weight to be given to evidence is wholly within the province of the jury, and any invasion of this province by the court in its orders is error; and any statement by the court, however unintentional, made in the presence of the jury, calculated to control the jury in its consideration of the weight to be given to [evidence], will work a reversal, unless it be clearly shown that such remarks have been explained and excluded from them."
Richardson v. State, 403 So.2d 293, 295 (Ala.Cr.App.1981). In reviewing the cautionary instruction given in this case by the trial court, we find no evidence that the trial court, either intentionally or unintentionally, made any statement that invaded the province of the jury. In fact, we have in other cases in which crime scene or autopsy pictures have been admitted upheld the admission of the photographs because of just such a cautionary instruction. Lee v. State, 562 So.2d 657, 664-65 (Ala.Cr.App.1989), cert. denied, 562 So.2d 657 (Ala.Cr.App.1990). We commend the trial court for reemphasizing to the jury its factfinding responsibility before exposing it to potentially inflammatory evidence. There is no error here, plain or otherwise.

XXV.
At the end of Burgess's discussion of the previous issue, he adds as an additional issue:
"The trial court erred in denying the appellant's motion for a reconstruction hearing. Numerous bench conferences were held during the trial which were not made a part of the court reporter's record on appeal.... The appellant has been denied a complete record in this case based upon the court's refusal to allow a reconstruction hearing and failure to include the testimony of bench conferences in the record."
(Appellant's Brief, p. 192.)[8]
In a post-trial hearing on Burgess's motion for a record reconstruction hearing, Burgess's counsel informed the trial court that "the thrust of our motion there is that any sidebars that dealt with issues involving admissibility of evidence, striking jurors, and that sort of thing" should have been transcribed and should be the subject of a reconstruction hearing. When reviewing specific instances in the record where Burgess argued that there were unrecorded bench conferences, the trial court noted that most were incidental occurrences that had nothing to do with the actual decisionmaking process of the trial. It also noted that there were unrecorded bench conferences with veniremembers who were asking to be relieved of jury duty. The record reflects that, if the trial court excused a veniremember, it announced the excuse and the court's decision on the record. If the trial court did not excuse the veniremember, the exchange went unrecorded. The trial court, during the motion hearing, reconstructed as many of these occurrences as it could remember. The trial court stated for the record:
"In this case and indeed in all of the cases of this nature, I tryI state very *192 clearly, and I'm certain I state very clearly to counsel, ... that all of our sidebars ... are to be part of the record. That's the reason I always have the defendant present and put everything on the record. That cannot mean, however, that every word said between the attorneys and every word even said between the court and the attorneys is always reflected in the presence of the court reporter and put in his record. There are occasions when I may ask an attorney or the attorney may approach me and a question is asked like, `... how much more time you think you're going to have of this witness.' ... Those kinds of things, sort of house-cleaning type discussions sometimes may not be taken by the court reporter.... Any discussion relative to a ruling by the court or on the rights of the defendant and the nature of the case needs to be in the record and I hopeI trust is and should be."
(Transcript of motion hearing 36-37.) The trial court then invited counsel to go back over each allegation of an unrecorded bench conference to determine if the court reporter had any transcript that had not been added to the record that should be in the record. Burgess has not alleged, nor has he demonstrated, either to the trial court or to this court, that he was prejudiced in any way by any alleged off-the-record bench conferences. Magwood v. State, 689 So.2d 959, 983 (Ala.Cr.App. 1996).
Rule 19.4(a), Ala.R.Crim.P., states that in all capital cases, the court reporter shall record the voir dire examination of the jury and the arguments of counsel. In Ex parte Harris, 632 So.2d 543, 545 (Ala. 1993), the Alabama Supreme Court noted that the phrase "arguments of counsel" does not refer to "every incidental discussion between counsel and the trial judge that occurs at the bench," but rather, refers only to counsel's opening and closing arguments. Thus, it is clear that Rule 19.4(a) does not require the court reporter to transcribe the various bench conferences. Ex parte Land, 678 So.2d 224, 245 (Ala.1996); Roberts v. State, 735 So.2d 1244, 1262-63 (Ala.Cr.App.1997). No error occurred when the trial court denied Burgess's motion for a reconstruction record.

XXVI.
In reviewing the sentence of death, as we are required to do by § 13A-5-53, Ala.Code 1975, we make the following findings: We have searched the record and have found no error in the sentencing proceedings adversely affecting Burgess's rights. Pursuant to Rule 45A, Ala.R.App. P., we have searched the entire proceedings under review and found no plain error or defect that has, or probably has, adversely affected any substantial right of Burgess's.
The trial court found the existence of one aggravating circumstance: that the capital offense was committed during the commission of a robbery in the first degree, § 13A-5-49(4).
The trial court found the existence of two statutory mitigating circumstances: that the defendant does not have a significant history of prior criminal activity, § 13A-5-51(1), and that the defendant was 18 years old at the time of the crime, § 13A-5-51(7). The trial court also found three nonstatutory mitigating circumstances: "the defendant's character, the defendant's home life, and the defendant's personality disorder."
It is the conclusion of this Court that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the record.
*193 As required by § 13A-5-53(b)(3), we must determine whether Burgess's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Burgess murdered a storekeeper during the course of a robbery. We note that at the time of this trial, two-thirds of Alabama death sentences were for robbery-murder. Kuenzel v. State, 577 So.2d 474, 530 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Henderson v. State, 583 So.2d 276, 304 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Stephens v. State, 580 So.2d 11, 26 (Ala.Cr. App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991).
It is the finding of this Court that death is the proper sentence in this case. There is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. The sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.
The judgment of the circuit court is affirmed.
AFFIRMED.
McMILLAN, BROWN, and BASCHAB, JJ., concur.
LONG, P.J., recuses himself.
NOTES
[1] See our discussion of the issue of pretrial publicity in Part VIII of this opinion, where we note that the televised admission, which was the source for much of the veniremember's knowledge of the case, was ultimately admitted into evidence.
[2] We agree with the State that the fact that one veniremember, Mr. O., apparently withheld that he had formed a fixed opinion in this case does not indicate that there were others who engaged in the same lack of honesty. Quite the opposite, the fact that other veniremembers stopped him when he tried to communicate his opinion to them, and then immediately informed the court of his behavior, shows the willingness of those veniremembers to take their juror's oath seriously.
[3] The police investigators were present only in the capacity of Burgess's escorts to the jail. The only words ever spoken by either officer was when one officer turned to the person who let them in the jailhouse door and told him to "close the door," thus ending Burgess's interview with the press.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] It is obvious from viewing the videotape of Burgess's statement to the press that Burgess was in full control of his faculties and was in a "talkative" mood shortly after the police recorded his statement.
[6] The trial court made the following statements in its order: "This was a cold blooded and senseless killing ... without any mercy for his victim ... for the heartless purpose of preventing this victim of a robbery from ever testifying against the Defendant." 523 So.2d at 1102.
[7] Burgess also expresses his doubts about the constitutionality of "double counting" the robbery as an element of the capital offense as well as an aggravating circumstance. That issue has already been decided adversely to Burgess. Price v. State, 725 So.2d 1003, 1056 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998).
[8] Rule 28(a)(5), Ala.R.App.P., requires that an argument contain "the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." By adding this issue as an aside to a completely different issue, Burgess renders this portion of his brief barely within the minimum requirements of Rule 28. But for the State's brief on this issue, the Court would have been hard-pressed to discern the full measure of this issue.